**William McCALLUM d/b/a Green Acres Coin Laundries and Concerned Water Users of Clarke County, Plaintiffs–Appellants,**

**v.**

**The CITY of ATHENS, GA a/k/a The Mayor and Council of the City of Athens, GA, Defendant–Appellee.**

**No. 91–8095.**

United States Court of Appeals, Eleventh Circuit.

Nov. 3, 1992.

**650**

John C. Butters, Atlanta, Ga., James F. Ponsoldt, Athens, Ga., for plaintiffs-appellants.

Denny C. Galis, Galis & Packer, Athens, Ga., Robert B. Langstaff, Albany, Ga., for defendant-appellee.

Before TJOFLAT, Chief Judge, HATCHETT, Circuit Judge, and HENDERSON, Senior Circuit Judge.

TJOFLAT, Chief Judge:

This case involves claims under the Sherman Act, 15 U.S.C. §§ 1 and 2 (1988), and the Robinson–Patman Act, 15 U.S.C. § 13 (1988), challenging a city's allegedly anticompetitive operation of a waterworks. We find that the city's anticompetitive conduct is protected from Sherman Act liability by the state action immunity doctrine under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny, and that appellants have failed to demonstrate sufficient interstate commerce to support their Robinson–Patman claim.[1] We therefore affirm the district court's decision granting summary judgment for the city and dismissing this case.

## I.

Appellants are the "Concerned Water Users of Clarke County" ("CWUCC"), an unincorporated association of over 100 members who are either commercial or residential consumers of treated water in Clarke County, Georgia, and William McCallum, the past owner of five now defunct coin-operated laundromats. Appellee is the City of Athens ("Athens"), a municipality located in Clarke County.

CWUCC and McCallum brought this suit on June 29, 1984. In their complaint, they alleged that Athens had violated the Robin-

---

1. The district court dismissed the Robinson–Patman claim for want of subject matter jurisdiction due to insufficient interstate commerce. Properly stated, interstate commerce is an element—albeit a jurisdictional element—of a Robinson–Patman claim.

> [W]hen a plaintiff makes a nonfrivolous allegation that the antitrust laws have been violated, a federal district court should take jurisdiction over the claim. If the defendant's argument is only that no interstate commerce is affected, he should move to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) or 12(c), ... or, if the claim survives such a motion, after appropriate discovery he may move for summary judgment under Rule 56. A motion to dismiss for lack of jurisdiction, pursuant to Rule 12(b)(1) or 12(h)(3), is inappropriate in such cases unless the interstate commerce claim is patently frivolous.

*George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 554 n. 3 (2d Cir.1977); *see also Bell v. Hood*, 327 U.S.

678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) (Suit may be dismissed "for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous."); *Eye Encounter, Inc. v. Contour Art, Ltd.*, 81 F.R.D. 683, 687 (E.D.N.Y.1979) (insufficient interstate commerce "issues are not jurisdictional but go to the elements of an antitrust cause of action"). Hence, the Robinson–Patman claim in this case should have been dismissed for failure to state a claim for which relief may be granted, rather than for lack of subject matter jurisdiction. "In either event, the critical inquiry is into the adequacy of the nexus between respondents' conduct and interstate commerce that is alleged in the complaint." *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 742 n. 1, 96 S.Ct. 1848, 1851 n. 1, 48 L.Ed.2d 338 (1976) (referring to Sherman Act).

son–Patman Act[2] and sections 1 and 2 of the Sherman Act,[3] and sought damages and injunctive relief. According to CWUCC and McCallum, since 1916 Athens has operated a for-profit waterworks that supplies water to city residents and, for a larger fee, to customers residing outside Athens' city limits. In 1916, Athens charged nonresidents 1.25 times the resident rate, and in the early 1970s Athens increased this charge to 2.5 times the resident rate. CWUCC and McCallum allege that, without justification for the cost differential, Athens currently charges nonresidents 2.25 times the resident rate in violation of the Robinson–Patman Act. They further allege that Athens illegally agreed with the neighboring Oconee County Public Utility Authority to divide up market territory in violation of section 2 of the Sherman Act. CWUCC and McCallum contend that Athens' anticompetitive practices are responsible for Athens having a 90 percent share of the treated water business in Clarke County.

Athens moved to dismiss the Sherman Act and Robinson–Patman Act claims, arguing that it enjoyed state action immunity from federal antitrust liability. Athens also suggested that the district court lacked subject matter jurisdiction over the Robinson–Patman claim, arguing that the complaint failed to demonstrate sufficient "in commerce" sales. After Athens' city charter and other relevant Georgia statutes were brought before the district court, *see infra* at 654–55, but before the parties engaged in any discovery, the court converted Athens' motion to dismiss into a motion for summary judgment under Fed. R.Civ.P. 12(b). The court granted Athens partial summary judgment, dismissing the Sherman Act claims under the state action immunity doctrine. *See Wall v. City of Athens*, 663 F.Supp. 747 (M.D.Ga.1987). The court then certified the state action immunity question for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). We refused, however, to entertain the appeal. Upon conclusion of the ensuing discovery, the court granted Athens summary judgment on the Robinson–Patman Act claim on the ground that CWUCC and McCallum had failed to demonstrate sufficient "in commerce" sales to support subject matter jurisdiction over the Robinson–Patman claim.[4] CWUCC and McCallum appealed to this court. We affirm.

## II.

Because this case comes to us on appeal from summary judgment,[5] we view the evidence and draw related inferences in the light most favorable to CWUCC and McCallum. *See Chapman v. American Cyanamid Co.*, 861 F.2d 1515, 1518 (11th

---

2. The Robinson–Patman Act, 15 U.S.C. § 13(a) (1988), provides in pertinent part that

   [i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce....

3. Section 1 of the Sherman Act, 15 U.S.C. § 1 (1988), provides in pertinent part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

   Section 2 of the Sherman Act, 15 U.S.C. § 2 (1988), provides in pertinent part that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any

other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony...."

4. In litigating this case in the district court, the parties filed several motions in addition to those described above. Only one is relevant to this appeal: Athens' motion to dismiss the Robinson–Patman claim on the ground that it was barred by the Local Government Antitrust Act, 15 U.S.C. § 35(a) (1988) ("No damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act (15 U.S.C. 15, 15a, or 15c) from any local government, or official or employee thereof acting in an official capacity."). Because we decide this case on other grounds, we do not consider the application of this statute to the facts of this case.

5. On this appeal, we are not confronted with any material factual controversy.

Cir.1988). In this part of our opinion, we consider the state action immunity issue that attends CWUCC's and McCallum's Sherman Act claims. In part III, we consider the interstate commerce deficiency of the Robinson–Patman claim.

### A.

In the landmark case of *Parker v. Brown,* 317 U.S. 341, 352, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943), the Supreme Court held that liability under the Sherman Act does not arise out of the anticompetitive conduct of states acting as sovereigns. Although "cities are not themselves sovereign," states may sanction cities' anticompetitive conduct, enshrouding the cities within the protective cloak of *Parker* immunity. *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 412–13, 98 S.Ct. 1123, 1136–37, 55 L.Ed.2d 364 (1978).

The Supreme Court expounded upon the application of *Parker's* state action immunity doctrine to the anticompetitive actions of cities in *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 40, 105 S.Ct. 1713, 1717, 85 L.Ed.2d 24 (1985). In *Town of Hallie,* a number of unincorporated townships alleged that the City of Eau Claire violated the Sherman Act by monopolizing the area's sewage treatment services and by refusing to provide sewage treatment to unannexed areas. Eau Claire sought *Parker* immunity based on a state statute that granted cities the authority to develop sewage systems and to " 'describe with reasonable particularity the district to be [served].' " *Town of Hallie,* 471 U.S. at 41, 105 S.Ct. at 1717 (quoting Wis.Stat. § 62.-18(1) (1981–1982)). Acknowledging that *Parker* immunity applies to a city's anticompetitive conduct sanctioned by a "clearly expressed state policy," the *Hallie* Court applied a foreseeability test to determine whether the statute clearly expressed a state policy allowing anticompetitive conduct. The Court noted that

> the statutes clearly contemplate that a city may engage in anticompetitive conduct. Such conduct is a foreseeable result of empowering the City to refuse to serve unannexed areas. It is not necessary ... for the state legislature to have stated explicitly that it expected the City to engage in conduct that would have anticompetitive effects.... [Rather,] it is sufficient that the statutes authorized the City to provide sewage services and also to determine the areas to be served. We think it is clear that anticompetitive effects logically would result from this broad authority to regulate.

*Id.,* 471 U.S. at 42, 105 S.Ct. at 1718 (citations omitted); *see also City of Lafayette,* 435 U.S. at 410, 98 S.Ct. at 1135 ("state policy ... [must be] clearly articulated and affirmatively expressed"). In short, the Court extended *Parker's* state action immunity doctrine to the city's anticompetitive conduct that was the foreseeable result of the state's express enactments. *See Consolidated Gas Co. v. City Gas Co.,* 912 F.2d 1262, 1329 (11th Cir.1990) (Tjoflat, C.J., dissenting) (Under *Town of Hallie,* "if the legislature, by displacing competition in a given field with a broad regulatory structure, has contemplated that such [anticompetitive] conduct might occur, that will satisfy the 'clearly articulated' requirement.").

The Supreme Court's most recent pronouncement on municipal state action immunity, *City of Columbia v. Omni Outdoor Advertising, Inc.,* —— U.S. ——, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), further entrenched foreseeability as the standard for determining whether cities act pursuant to "clearly articulated and affirmatively expressed" state policy. In *City of Columbia,* a city passed an extremely restrictive billboard zoning regulation that effectively preserved one billboard company's existing monopoly. Responding to a potential competitor's antitrust challenge to the city's action, the city sought state action immunity under *Parker.* The Court held that the city was immune from federal antitrust liability under *Parker.* Instructively, the Court held that to enjoy immunity from federal antitrust liability, the city must establish that (1) the state has generally authorized the city to perform the challenged action, and (2) the "suppression of competi-

tion is the 'foreseeable result' of what the statute authorizes." *City of Columbia,* —— U.S. at ——, 111 S.Ct. at 1350.[6]

CWUCC and McCallum argue that Georgia's enabling legislation authorizing the creation of Athens' water distribution system does not constitute a sufficiently clear expression of state policy.[7] We disagree. As we discuss below, Georgia's extensive statutory regime governing municipal waterworks indicates that Georgia has "clearly articulated and affirmatively expressed" a state policy to displace competition in the provision of water treatment services. We begin by comparing Georgia's statutes in the instant case with those found to be sufficiently clear in three paradigmatic cases, one from the Supreme Court and two from this court. We conclude by considering additional Georgia enactments that further reveal the state's contemplation of municipal anticompetitive conduct.

B.

Initially, we compare the Georgia statutes relating to municipal waterworks in this case with the Wisconsin statutes relating to municipal sewage systems in *Town of Hallie.* The *Town of Hallie* Court found two statutory grants of authority sufficient to articulate clearly and express affirmatively a state policy permitting anticompetitive conduct. The Court found that "it is sufficient that the statutes authorized the City to provide sewage services and also to determine the areas to be served. We think it is clear that anticompetitive effects logically would result from this broad authority to regulate." *Town of Hallie,* 471 U.S. at 42, 105 S.Ct. at 1718.

**6.** The Court noted that the "clear articulation of a state policy to authorize anticompetitive conduct" requirement is determined under foreseeability analysis. *Id.* at ——, 111 S.Ct. at 1350. The Court clarified that it "ha[s] rejected the contention that this requirement can be met only if the delegating statute explicitly permits the displacement of competition." *Id.* (citing *Town of Hallie,* 471 U.S. at 41–42, 105 S.Ct. at 1717–18); *see also* Merrick B. Garland, *Antitrust and State Action: Economic Efficiency and the Political Process,* 96 Yale L.J. 486, 496 (1987) (The distinction between general and industry-specific grants of local authority in *Town of Hallie* "could be read as signaling the Court's willingness to immunize any municipal regulation as long as the state has authorized the city to regulate that specific market sector—even if the state has not necessarily contemplated anticompetitive behavior.") (footnote omitted); Brent S. Kinkade, Note, Municipal Antitrust Immunity After City of Columbia v. Omni Outdoor Advertising, Inc., *111 S.Ct. 1344* (1991), 67 Wash.L.Rev. 479, 494 (1992) ("*Omni*'s reliance on [*Town of Hallie*'s] foreseeability standard ... shows that the Court has implicitly abandoned the clear articulation test.").

Of course, "the requirement of 'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive." *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 55, 102 S.Ct. 835, 843, 70 L.Ed.2d 810 (1982). In *City of Boulder,* the Court held that a bald constitutional provision granting cities "the full right of self-government in both local and municipal matters" did not reflect a clearly articulated and affirmatively expressed state policy of replacing competition with regulation. *Id.* at 43, 102 S.Ct. at 837. The Court found it significant that the constitutional provision did not even remotely address the relevant field of business at issue. Indeed, the Court noted that "[a] State that allows its municipalities to do as they please can hardly be said to have 'contemplated' the specific anticompetitive actions for which municipal liability is sought." *Id.* at 55, 102 S.Ct. at 843. As discussed *infra,* Georgia's statutes in the case at bar are far from neutral.

**7.** CWUCC and McCallum also contend that the proprietary nature of Athens' waterworks precludes application of *Parker*'s state action immunity. The Supreme Court rejected a similar contention in *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 541–43, 105 S.Ct. 1005, 1012–13, 83 L.Ed.2d 1016 (1985). There, the Court reaffirmed that it had abandoned long ago the distinction between "governmental" and "proprietary" functions. *See New York v. United States,* 326 U.S. 572, 583, 66 S.Ct. 310, 316, 90 L.Ed. 326 (1946) (rejecting as "untenable" the distinction among "proprietary," "governmental," "historically sanctioned activities of Government," and "activities conducted merely for profit," in the context of a tax case testing the reach of the commerce clause). Further, the *Garcia* Court addressed the precise municipal function at issue in the case at bar— the operation of a municipal water supply business—and noted that the Court had long ago established that "the provision of a municipal water supply *was* ... an essential governmental function, even though municipal waterworks long had been operated at a profit by private industry." *Garcia,* 469 U.S. at 542, 105 S.Ct. at 1013 (citing *Brush v. Commissioner,* 300 U.S. 352, 370–73, 57 S.Ct. 495, 500–02, 81 L.Ed. 691 (1937)).

Regarding the first statutory grant, the *Town of Hallie* Court noted that Wisconsin authorized its cities to "construct, add to, alter, and repair sewage systems." Id. at 41, 105 S.Ct. at 1717. In the present case, Georgia authorized Athens "to construct, to reconstruct, to improve, to better, and to extend any water system." O.C.G.A. § 36–34–5(1) (Supp.1986); *see also* Ga. Const. Art. IX, § 2, ¶ 3(a)(7) (authorizing municipal "[d]evelopment, storage, treatment, purification and distribution of water"); O.C.G.A. § 36–34–5(3) (Supp.1986) (authorizing municipalities "[t]o operate and maintain any such [water] systems"); City of Athens—New Charter § 1–103(a), 1979 Ga.Laws 3770, 3772 [8] ("[Athens] may acquire, construct, and maintain, by condemnation or otherwise, inside or outside the city limits, ... waterworks systems"). Georgia's grant of authority is at least as clear as Wisconsin's in *Town of Hallie.*

Regarding the second statutory grant, the *Town of Hallie* Court noted that Wisconsin "empower[ed] the City to refuse to serve unannexed areas." 471 U.S. at 42, 105 S.Ct. at 1718. Georgia similarly authorized Athens to determine what areas to serve. Specifically, Georgia authorized Athens to provide services to territories outside Athens' city limits pursuant to contract. *See* Ga. Const. Art. IX, § 2, ¶ 3(b)(2) ("Unless otherwise provided by law, ... [n]o municipality may exercise any of the powers listed in subparagraph (a) of this Paragraph or provide any service listed therein [including "treatment, purification, and distribution of water"] outside its own boundaries except by contract with the county or municipality affected."); City of Athens—New Charter § 1–103(a). The court below concluded, and we agree, that "in *Hallie* itself, the statutes were no more explicit than the statutes in this case." *Wall,* 663 F.Supp. at 759.

## C.

We believe that *Town of Hallie* firmly illustrates Athens' entitlement to state action immunity. To dispel any lingering doubts, however, we compare the Georgia statutes in this case with those that we found sufficient for state action immunity in *Falls Chase Special Taxing District v. City of Tallahassee,* 788 F.2d 711 (11th Cir.1986), and *Auton v. Dade City,* 783 F.2d 1009 (11th Cir.1986). At issue in both *Falls Chase* and *Auton* was whether the Florida statutes authorizing municipal water systems satisfied *Town of Hallie's* "clearly articulated and affirmatively expressed" state policy requirement. In both cases, we held that Florida's statutory regime constituted a sufficiently clear expression of state policy to immunize the respective cities' anticompetitive conduct.

Georgia's statutory regime is remarkably similar to the Florida regime. The first Florida statute authorized cities to create and construct municipal water supplies. *Falls Chase,* 788 F.2d at 713; *Auton,* 783 F.2d at 1010. Georgia's analogues are O.C.G.A. § 36–34–5(1), and Ga. Const. Art. IX, § 2, ¶ 3(a)(7). A second Florida statute granted municipalities the power of eminent domain. *Falls Chase,* 788 F.2d at 713; *Auton,* 783 F.2d at 1011. Georgia's analogues are O.C.G.A. § 36–34–5(1), and City of Athens—New Charter § 1–103(a). A third Florida statute authorized municipalities to fix water rates. *Falls Chase,* 788 F.2d at 714; *Auton,* 783 F.2d at 1011. Georgia's analogue is O.C.G.A. § 36–34–5(4). A fourth Florida statute provided that municipalities may not construct a water system if a similar system already exists in immediately adjacent territory. *Falls Chase,* 788 F.2d at 713; *Auton,* 783 F.2d at 1010. In *Falls Chase* and *Auton,* we found that by enacting this statute, "the legislature recognized that municipal

---

**8.** Through this statute, Georgia adopted the City of Athens' City Charter as state law. Nevertheless, the district court refused to recognize the City Charter as part of Georgia's state law, finding that "[t]he mere fact that the charter has been adopted into Georgia Laws does not mean that the state has considered every provision

therein, and considers it to express state policy." *Wall,* 663 F.Supp. at 758. We disagree. The Georgia legislature has seen fit to adopt the charter as state law. This court will not sit in judgment of the propriety of the Georgia legislature's method of enacting legislation.

public works often require anticompetitive practices." *Falls Chase*, 788 F.2d at 713; *Auton*, 783 F.2d at 1010. Georgia's analogues are Const. Art. IX, § 2, ¶ 3(b)(2), and City of Athens—New Charter § 1–103(a). These Florida and Georgia enactments implement each state's judgment that cities must respect another entity's preexisting provision of services within a given territory. The clear implication is that these state policies oppose competition among water providers within a single territory. The enactments contemplate anticompetitive effects in general and territorial allocations in particular.

### D.

Complementing the striking parallel between the statutes considered in *Town of Hallie, Auton,* and *Falls Chase,* and the provisions in the case at hand, Georgia has enacted additional legislation designed to dispel any doubt about its cities' immunity from antitrust liability. Although the *Town of Hallie* Court rejected the suggestion that "a legislature must expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects" as too burdensome a requirement, 471 U.S. at 43, 105 S.Ct. at 1719, that is exactly what Georgia has tried to do. Positioned at the end of the chapter authorizing the creation of municipal waterworks are O.C.G.A. §§ 36–19–1 and 2, *redesignated as* O.C.G.A. §§ 36–65–1 and 2 *by* 1985 Ga. Law § 36, reflecting Georgia's acknowledgment that municipal anticompetitive conduct may flow from the state's various authorizations. O.C.G.A. § 36–65–1 provides that "in the exercise of powers specifically granted to them by law, local governing authorities of cities and counties are acting pursuant to state policy." O.C.G.A. § 36–65–2 provides that "[t]his chapter is intended to articulate clearly and express affirmatively the policy of the State of Georgia that in the exercise of such pow-

ers, such local governing authorities shall be immune from antitrust liability to the same degree and extent as enjoyed by the State of Georgia." At the very least, by enacting O.C.G.A. §§ 36–65–1 and 2, Georgia unequivocally revealed that it contemplated that its municipalities might engage in anticompetitive conduct.[9] Georgia's express contemplation of municipal anticompetitive conduct satisfies the *Town of Hallie* test for municipal immunity. Athens is immune from Sherman Act liability under *Parker*'s state action immunity doctrine.

### III.

In its order granting summary judgment on CWUCC's and McCallum's Robinson–Patman claim, the district court found that it lacked subject matter jurisdiction for two reasons. First, the court found that CWUCC and McCallum failed to establish that Athens engaged in the requisite level of interstate commerce to support their Robinson–Patman claim. Second, the court reasoned that CWUCC and McCallum failed to demonstrate the existence of any competing businesses that benefitted from the alleged price discrimination. We affirm because CWUCC and McCallum have failed to meet the Robinson–Patman Act's "in commerce" requirement, and do not consider the district court's second reason for its decision.

■ In contrast with the Sherman Act, in which Congress exercised "the utmost extent of its Constitutional power in restraining trust and monopoly agreements," *United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 558, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440 (1944), "the distinct 'in commerce' language of the Clayton and Robinson–Patman Act[s] ... denote[s] only persons or activities within the flow of interstate commerce—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the con-

---

9. Of course, "the State may not validate a municipality's anticompetitive conduct simply by declaring it to be lawful." *Town of Hallie,* 471 U.S. at 39, 105 S.Ct. at 1716 (citing *Parker,* 317 U.S. at 351, 63 S.Ct. at 313). Yet, Georgia does not seek to declare lawful conduct that is not. Rather, Georgia simply expresses its state policy favoring municipal immunity from liability. Immunity does not alter the legal character of the immune act; it simply disallows recovery.

sumer," *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974). Claims under the Robinson–Patman Act must be predicated on the occurrence of an interstate sale of the relevant commodity. *See S & M Materials Co. v. Southern Stone Co.*, 612 F.2d 198, 200 (5th Cir.1980) ("the cases establish that the state of being 'in commerce' under § 2(a) [of the Robinson–Patman Act] requires physical movement of the *relevant product* across a state line") (emphasis added).[10]

In the instant case, CWUCC and McCallum contend that sufficient interstate commerce exists because (1) Athens purchased water-purifying chemicals from out of state, (2) Athens drew its water from a river flowing across state lines, and (3) a consumer of Athens' water resells the water as ice used for packing chickens to out-of-state customers. We address each of CWUCC's and McCallum's contentions in turn.

### A.

■ Initially, CWUCC and McCallum assert that Athens' out-of-state purchase of chlorine and fluoride, water-purifying chemicals, establishes sufficient interstate commerce to support their Robinson–Patman claim.[11] CWUCC and McCallum argue that Athens effectively resold the chlorine and fluoride in Georgia in a continuing flow of interstate commerce. CWUCC and McCallum expressly assert that chlorine and fluoride are not simply ingredients of treated water, but are resold in unchanged form, albeit combined with water. Ostensibly, CWUCC and McCallum attempt to characterize Athens' interstate purchase of chlorine and fluoride as part of a continuous flow of chlorine and fluoride from out of state to in-state purchasers of chlorine and fluoride. In support of this proposition, CWUCC and McCallum provide general citations to three cases.

CWUCC's and McCallum's first cite is *Standard Oil Co. v. Federal Trade Commission*, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951). Standard Oil purchased crude oil from western states, refined the crude into gasoline in Indiana, and shipped the gasoline to Michigan where it was temporarily stored and subsequently sold. The Court found that Standard Oil's sales of gasoline in Michigan satisfied the Robinson–Patman Act's interstate commerce requirement. *Id.* at 237, 71 S.Ct. at 243. The Court found it significant that the final product itself, gasoline, was shipped across state lines in an uninterrupted flow of commerce. *Id.* at 237–39, 71 S.Ct. at 243–44.

CWUCC's and McCallum's second cite is *McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487 (11th Cir.1988). Northern Propane both produced and purchased propane in certain western states and transported it by pipeline to 25 other states where the propane was sold. Northern Propane held the propane at pipeline terminals prior to distribution pursuant to sales within the state. Relying on *Standard Oil*, the court found that it had Robinson–Patman jurisdiction. *Id.* at 1506 n. 46.

CWUCC's and McCallum's third cite is *Foremost Dairies, Inc. v. Federal Trade Commission*, 348 F.2d 674 (5th Cir.1965). Foremost Dairies purchased about 20 percent of its supply of milk from Colorado dairy farmers and about 80 percent from New Mexico dairy farmers. Foremost Dairies combined, pasteurized, and standardized the milk in New Mexico, and then sold the milk to its New Mexico customers. Relying on *Standard Oil*, the court found that it had Robinson–Patman jurisdiction. *Id.* at 678. The court found it significant that "the fluid milk undergoes a rather negligible processing, in general moving in a constant flow [of commerce,]" and that

---

**10.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**11.** Athens stipulated that it purchased "fluoride and chlorine" from out-of-state suppliers, and "placed these products directly into the water during the purification process." *See* Record, vol. 2, no. 65 at 1.

the milk underwent a minimal "degree of product transformation." *Id.* at 678 & n. 8.

As a prelude to distinguishing CWUCC's and McCallum's cases, and to elucidate the state of the law, we introduce two additional cases. In *Bacon v. Texaco, Inc.*, 503 F.2d 946 (5th Cir.1974), *cert. denied*, 420 U.S. 1005, 95 S.Ct. 1447, 43 L.Ed.2d 763 (1975), our predecessor circuit considered a situation analogous to the instant case. The court held that the interstate purchase of crude oil did not bring the subsequent intrastate sale of refined oil within our Robinson–Patman jurisdiction. The *Bacon* court indicated that *Standard Oil Co.* and *Foremost Dairies, Inc.* were inapposite

> since the sales at issue in [*Bacon*], unlike the sales in *Standard Oil Co.* and *Foremost Dairies, Inc.*, involve products which have undergone substantial change through processing after entering the State of sale. The extensive process involved in refining crude oil into gasoline results in the alteration of the nature of the product. No "flow of commerce" ever took place as to the gasoline which is the subject of this claimed wrong. Therefore the prior travels of the atoms and molecules of crude oil from which it came are not determinative of the inter- versus intra-state nature of the end product refined therefrom.

*Id.* at 948. *Bacon's* crude oil is more closely related to the final product gasoline than are the instant case's chlorine and fluoride related to treated water. This case presents a much stronger basis for refusing to find sufficient interstate commerce to support a Robinson–Patman claim.

Similarly, in *Scranton Construction Co. v. Litton Industries Leasing Corp.*, 494 F.2d 778 (5th Cir.1974), the defendant purchased cement and other ingredients from out-of-state suppliers, and then mixed and sold the final product, ready-mix concrete, strictly to in-state customers. The court held that the interstate purchase of ingredients which were transformed into a different end product sold in intrastate commerce did not support Robinson–Patman jurisdiction. The court reasoned that "the

interstate movement of mere ingredients [does not] suffice [for Robinson–Patman jurisdiction.]" *Id.* at 781.

Unlike the commodities at issue in *Standard Oil, McGahee,* and *Foremost Dairies,* neither the chlorine nor fluoride in the present case is resold as chlorine or fluoride. Rather, the chemicals are combined with water and transformed into an entirely distinct commodity. The final product that Athens sells, water, differs significantly from the elemental ingredients purchased in interstate commerce. Undoubtedly, Athens' customers believe that they are purchasing water, not chlorine and fluoride. Athens is engaged in the business of selling treated water, not hydrated chlorine and fluoride.

Even if the chlorine and fluoride maintain their chemical composition when immersed in water, both *Bacon* and *Scranton Construction Co.* establish the interstate commerce deficiency in CWUCC's and McCallum's theory. While Athens purchased chlorine and fluoride from out-of-state suppliers, it sold its final product—a product entirely distinct from chlorine and fluoride—strictly to intrastate customers. *Bacon* establishes that such product transformation defeats CWUCC's and McCallum's allegation of interstate commerce. Further, the chlorine and fluoride that Athens purchases from out-of-state suppliers are ingredients of the final product that Athens sells, treated water. *Scranton Construction Co.* unequivocally rejects the proposition that interstate purchases of ingredients constitute sufficient interstate commerce to support Robinson–Patman claims arising out of purely intrastate sales of the final product.

### B.

■ CWUCC's and McCallum's second asserted basis for establishing interstate commerce under the Robinson–Patman Act is that Athens takes its water from the Oconee River which derives water from out-of-state sources. The argument seems to be that because the river water moves across state lines, Athens is involved in

interstate commerce. Even if we accepted this characterization—which we do not—the allegation would fail to demonstrate sufficient interstate commerce under the Robinson–Patman Act. Sales that merely "affect" interstate commerce do not meet Robinson–Patman's "in commerce" standard. *See Gulf Oil Corp.*, 419 U.S. at 195, 95 S.Ct. at 398 ("[T]he jurisdictional requirements of [the Robinson–Patman Act] cannot be satisfied merely by showing that allegedly anticompetitive acquisitions and activities *affect* commerce."). Of course, CWUCC and McCallum do not even allege that Athens purchases its water from the Oconee River. Rather, they contend that because Athens uses water that has traveled across state lines, Athens is liable under Robinson–Patman. This contention simply ignores the Robinson–Patman Act's stringent interstate commerce requirement. *See Id.* at 195, 95 S.Ct. at 398 (valid Robinson–Patman claim must allege that "at least one ... discriminatory sale[ ] was made in interstate commerce").

### C.

■ CWUCC's and McCallum's last argument seeking to establish interstate commerce under the Robinson–Patman Act borders on frivolous. CWUCC and McCallum allege that Central Soya, a seller of frozen chickens, purchased water from Athens and then resold some of that water in interstate commerce as packing ice for its chickens. CWUCC's and McCallum's theory is that Central Soya's resale of chickens packed in ice creates an interstate sale of treated water that may be attributed to Athens for Robinson–Patman purposes.

Central Soya is in the business of selling fowl, not fluids. Central Soya's resale of the water that it purchased from Athens is irrelevant to determining whether Athens has engaged in interstate commerce under Robinson–Patman. CWUCC and McCallum cite no authority for the proposition that allegations of a consumer's interstate resale of a product purchased in strictly intrastate commerce is sufficient to state a Robinson–Patman claim against the initial intrastate seller. Athens' sale of water is the relevant sale, not Central Soya's sale of chickens.

### IV.

We hold that Athens enjoys *Parker* state action immunity from liability under the Sherman Act, and that CWUCC and McCallum have failed to demonstrate sufficient interstate commerce to support their Robinson–Patman Act claim. Accordingly, we affirm the decision of the district court.

AFFIRMED.