[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11014

_____

D.C. Docket No. 3:17-cv-00003-TCB


DIVERSE POWER, INC.,

Plaintiff-Appellee,

versus

CITY OF LAGRANGE, GEORGIA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 20, 2019)

Before TJOFLAT, JORDAN and ANDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

This interlocutory appeal asks us to determine whether the City of LaGrange, Georgia, enjoys state-action immunity when it ties its water-utility service to its natural-gas service for customers in unincorporated Troup County, Georgia. The District Court held that LaGrange was not entitled to state-action immunity and, for the reasons explained below, we affirm.

I.

LaGrange owns and operates a water-utility system that serves customers within LaGrange's city limits as well as customers beyond its city limits in unincorporated Troup County. For much of unincorporated Troup County, LaGrange is the only provider of water-utility service. LaGrange maintains this monopoly through explicit, market-dividing agreements with other municipalities in the area. In addition to water, LaGrange provides natural gas to customers inside and outside its city limits. As with water, LaGrange's gas is the only game in town for much of unincorporated Troup County.

Diverse Power is a Georgia corporation that provides electric service throughout much of unincorporated Troup County. While LaGrange also provides electric service, it does so primarily within its city limits. Where Diverse Power's electric service and LaGrange's gas service overlap—in much of unincorporated Troup County—the two entities are in direct competition for retail energy customers.

2

In 2004, the LaGrange City Council enacted Ordinance No. 4-29 (the "Ordinance"), now codified at § 20-15-6 of the LaGrange Code of Ordinances. Titled "Water service outside city limits," the Ordinance provides:

> For all new construction outside of the corporate limits of the city, . . . water service as set forth in this chapter shall be available only to those customers who install at least one (1) natural gas furnace, one (1) natural gas water heater, and at least one (1) additional natural gas outlet sufficient for potential future use for a clothes dryer, range, grill, pool heater or outdoor lighting fixture.

LaGrange, Ga. Code § 20-15-6 (2004). LaGrange enforces the Ordinance by sending form letters to prospective builders and developers in the area informing them of the Ordinance's conditions. The letter, headed "IMPORTANT NOTICE CONCERNING WATER SERVICE OUTSIDE THE CITY LIMITS," states:

> This letter is to inform you of a utility policy that applies to all new water connections outside of the city limits of LaGrange. In areas where natural gas service is available, new homes or businesses must install gas appliances in order to receive water service from the City. Specifically, at least one gas furnace, one gas water heater, and one gas outlet for a future appliance such as a dryer or stove must be installed. Builders that do not comply with this policy will be denied permanent water service.

The purpose of the Ordinance is clear. As LaGrange's utility director stated in a 2008 email, "[LaGrange] decided to use water as leverage to require gas" in developments outside LaGrange's city limits. But for subdivisions within LaGrange's city limits, the utility director explained that LaGrange "can't use water as leverage to require gas." For these intracity developments, the director

3

continued, LaGrange uses a combination of rebates and incentives to encourage developers to install gas appliances.

The effect of the Ordinance is equally clear. Consider the Cameron Pointe subdivision, which sits on the north and south sides of Cameron Mill Road in unincorporated Troup County. The houses on the south side of the road were built before the enactment of the Ordinance, and the houses on the north side were built afterward. Predictably, the houses on the south side of the road were built to use electricity for all appliances, while the houses on the north side of the road were built for natural-gas appliances. To be sure, this temporal relationship doesn't prove that developers switched to natural gas *because of* the Ordinance. But lest one suspect that market forces drove this strange arrangement, the developer told Diverse Power that, but for the Ordinance, it would have built the houses on the north side of the road to use electric rather than natural-gas appliances.

On March 3, 2017, Diverse Power filed suit against LaGrange for violations of the Sherman and Clayton Antitrust Acts. Specifically, Diverse Power alleged that LaGrange's practice of conditioning water service on the installation of natural gas appliances constituted an unlawful tying arrangement. LaGrange moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) on several bases, including immunity under the state-action doctrine. The District Court

4

denied LaGrange's motion. *Diverse Power, Inc. v. City of LaGrange*, No. 3:17-v-00003-TCB, slip op. at 25 (N.D. Ga. Feb. 21, 2018). LaGrange timely appealed the District Court's order denying state-action immunity, which we have jurisdiction to review under the collateral order doctrine. *See Commuter Transp. Sys., Inc. v. Hillsborough Cty. Aviation Auth.*, 801 F.2d 1286, 1289–90 (11th Cir. 1986) (holding that denial of state-action immunity is an appealable collateral order under *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S. Ct. 1221 (1949)).[1]

---

[1] Diverse Power argued in response to LaGrange's civil appeal statement that the District Court's order denying state-action immunity was not an appealable collateral order under *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S. Ct. 1221 (1949). *See* Diverse Power's Resp. to Civil App. Statement at 4 (filed April 16, 2018). Specifically, Diverse Power suggested that *Commuter Transportation Systems, Inc. v. Hillsborough County Aviation Authority*—where we initially extended *Cohen* to denials of state-action immunity—was either "wrongly decided" and/or "abrogated by more recent decisions of the Supreme Court emphasizing the narrowness of [the collateral order] doctrine." *Id.*

We happen to think that *Commuter Transportation* was correctly decided. For the reasons articulated in that opinion and more, we think it's clear that state-action immunity is a form of immunity from suit, not merely from liability. And denials of immunity from suit—like denials of sovereign and qualified immunities—are immediately appealable under the collateral order doctrine. *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147, 113 S. Ct. 684, 689 (1993) (sovereign immunity); *Mitchell v. Forsyth*, 472 U.S. 511, 536, 105 S. Ct. 2806, 2820 (1985) (qualified immunity). But even if we agreed with Diverse Power on this point, we'd be powerless to do anything: *Commuter Transportation* is a decision of this Court that has not been overturned en banc.

That we haven't overturned *Commuter Transportation* wouldn't matter if the Supreme Court had abrogated *Commuter Transportation* or another case presenting the same issue. This brings us to Diverse Power's second argument: that *Commuter Transportation* has been abrogated by more recent Supreme Court decisions narrowing the collateral order doctrine. Though Diverse Power confidently stated this conclusion in its response, none of the cases it cited has anything to do with the state-action doctrine. *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 130 S. Ct. 599 (2009) (attorney-client privilege); *Will v. Hallock*¸ 546 U.S. 345, 126 S. Ct. 952 (2006) (Federal Tort Claims Act's judgment bar); *Cunningham v. Hamilton*

II.

We review *de novo* the denial of a motion to dismiss based on state-action immunity. *Danner Constr. Co. v. Hillsborough County*, 608 F.3d 809, 812 (11th Cir. 2010). "On a motion to dismiss, the factual allegations in the complaint are taken as true, even if they are subject to dispute." *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1220 (11th Cir. 2018). But we are not "bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007) (citation omitted).

III.

A.

The doctrine of state-action immunity insulates states from suit under the federal antitrust laws. In *Parker v. Brown*, 317 U.S. 341, 62 S. Ct. 307 (1943), the Supreme Court held that because "nothing in the language of the Sherman Act or in its history" suggested that Congress meant to restrict the states' sovereign prerogative to regulate their economies, the Act shouldn't be read to bar states

---

*County*, 527 U.S. 198, 119 S. Ct. 1915 (1999) (order imposing sanctions for discovery abuses); *Dig. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 114 S. Ct. 1992 (1994) (order vacating dismissal and rescinding a settlement agreement); *P.R. Aqueduct*, 506 U.S. 139, 113 S. Ct. 684 (Eleventh Amendment immunity); *Van Cauwenberghe v. Biard*, 486 U.S. 517, 108 S. Ct. 1945 (1988) (immunity from civil process).

So Diverse Power must be inferring from refusals to extend *Cohen* in *completely different areas of substantive law* that the Supreme Court will *eventually* declare denials of state-action immunity to be outside of *Cohen*. Suffice it to say, that's a far cry from an abrogation.

from engaging in anticompetitive conduct "as an act of government." *Id.* at 350, 352, 63 S. Ct. at 313–14. But because political subdivisions—like the City of LaGrange—"are not themselves sovereign[,] they do not receive all the federal deference of the States that create them." *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 412, 98 S. Ct. 1123, 1136 (1978) (plurality opinion). Instead, political subdivisions enjoy state-action immunity when they undertake activities "pursuant to a 'clearly articulated and affirmatively expressed' state policy to displace competition." *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 226, 133 S. Ct. 1003, 1011 (2013) (quoting *Cmty. Commc'ns Co. v. Boulder*, 455 U.S. 40, 52, 102 S. Ct. 835, 841 (1982)). This is commonly known as the clear-articulation requirement.

The clear-articulation requirement is itself anything but pellucid. And unlike clear-statement requirements in other domains of law,[2] the clear-articulation requirement is often satisfied by articulations that are admittedly less than clear. The Supreme Court has "rejected the contention that [the clear-articulation] requirement can be met only if the delegating statute explicitly permits the displacement of competition." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 372, 111 S. Ct. 1344, 1350 (1991). Instead, state-action immunity

---

[2] *See generally* John F. Manning, *Clear Statement Rules and the Constitution*, 110 Colum. L. Rev. 399 (2010).

7

applies when a municipality's anticompetitive conduct is the "foreseeable result" of state legislation. *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 42, 105 S. Ct. 1713, 1718 (1985).

For example, in *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S. Ct. 1344 (1991), the City of Columbia, South Carolina used its zoning power to protect an entrenched billboard provider—who had 95% market share—against outside competition. *Id.* at 367–68, 111 S. Ct. at 1347–48. Even though the state zoning statute under which the city promulgated the zoning restrictions had nothing to do with the suppression of competition—much less in the commercial billboard industry—the Supreme Court held that the city's actions were immune from federal antitrust liability. As the Court explained,

> The very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition, particularly on the part of new entrants. A municipal ordinance restricting the size, location, and spacing of billboards (surely a common form of zoning) necessarily protects existing billboards against some competition from newcomers.

*Id.* at 373, 111 S. Ct. at 1350.

And *Omni* isn't an outlier. In the earlier *Hallie* case, the Supreme Court held that the City of Eau Claire was immune from federal antitrust liability based on similarly broad state statutes that were facially unrelated to the suppression of competition. In *Hallie*, a Wisconsin statute authorized cities to construct sewage

8

systems and provided that municipal utilities had no obligation to serve areas outside their corporate limits.  471 U.S. at 41, 105 S. Ct. at 1717.  Under these statutes, Eau Claire offered sewage-treatment services (over which it had a local monopoly) to adjacent towns, but only on the condition that the towns accepted sewage-collection and -transportation services from Eau Claire.  *Id.* at 36–37, 105 S. Ct. at 1715.  Several neighboring towns sued, alleging that Eau Claire had impermissibly used its monopoly over sewage-treatment services to increase its share of the sewage-collection and -transportation markets.  *Id.*  Eau Claire raised the defense of state-action immunity, and the towns responded that the state laws authorizing Eau Claire to refuse service to unincorporated towns did "not evidence a state policy to displace competition in the provision of sewage services because they ma[d]e no express mention of anticompetitive conduct."  *Id.* at 41–42, 105 S. Ct. at 1718.

The Court disagreed.  Rejecting the towns' clear-articulation argument, the Supreme Court explained that Eau Claire's anticompetitive conduct logically resulted from the city's authority under Wisconsin law:

> [T]he statutes clearly contemplate that a city may engage in anticompetitive conduct.  Such conduct is a foreseeable result of empowering the City to refuse to serve unannexed areas. . . . [I]t is sufficient that the statutes authorized the City to provide sewage services and also to determine the areas to be served.  We think it is clear that anticompetitive effects logically would result from this broad authority to regulate.

9

*Id.* at 42, 105 S. Ct. at 1718.

It was against this legal backdrop that we decided *FTC v. Phoebe Putney Health System, Inc.*, 663 F.3d 1369 (11th Cir. 2011), *rev'd*, 568 U.S. 216, 133 S. Ct. 1003 (2013).

B.

In *Phoebe Putney*, two Georgia laws—a provision of the state constitution and a concurrently enacted statute—gave municipally created hospital authorities 27 enumerated powers, including "the power '[t]o acquire by purchase, lease, or otherwise and to operate projects [*i.e.*, hospitals and other public health facilities].'" *Phoebe Putney*, 568 U.S. at 221, 133 S. Ct. at 1007–08 (first alteration in original). Under these laws, the Hospital Authority of Albany-Dougherty County—which already owned one major regional hospital—sought to acquire another hospital. *Id.* at 221–22, 133 S. Ct. at 1008. Together, the two hospitals accounted for 86 percent of the market for acute-care hospital services in the six surrounding counties. *Id.* As such, the transaction raised the regulatory eyebrows of the FTC, which ultimately filed suit (along with the State of Georgia) to enjoin the transaction.

When the case came before us, we acknowledged that the transaction would "substantially lessen competition or tend to create, if not create, a monopoly." *Id.* at 222–23, 133 S. Ct. at 1009. But we also acknowledged that Georgia law gave

10

hospital authorities the prerogative to purchase hospitals and other health facilities, a grant of authority that might foreseeably produce anticompetitive results. *Id.* This was especially true given that many of Georgia's more rural healthcare markets were at the time of the authorizing laws' passage so sparsely populated as to support only a few regional hospitals. *Id.* at 231, 133 S. Ct. at 1014. As a result, most state-law-authorized purchases of a hospital by a hospital authority would substantially lessen competition in a given market. Accordingly, because it appeared clear that the power to acquire hospitals in markets with few hospitals reasonably anticipated the power to anticompetitively consolidate the hospital-services market, we affirmed the District Court's order granting state-action immunity. *Phoebe Putney*, 663 F.3d at 1378.

We got reversed, nine-zip. While the Supreme Court reaffirmed foreseeability as the touchstone of the clear-articulation test, *id.* at 226–27, 113 S. Ct. at 1011, the Court placed narrower bounds on the meaning of foreseeability. Under the reformulated test, "state policy to displace federal antitrust law [is] sufficiently expressed where the displacement of competition [is] the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature." *Id.* at 229, 113 S. Ct. at 1012–13. "[T]he ultimate requirement [is] that the State must have affirmatively contemplated the displacement of

11

competition such that the challenged anticompetitive effects can be attributed to the 'state itself.'" *Id.* at 229, 113 S. Ct. at 1012 (citation omitted).

How did this rearticulated test apply to the facts of *Phoebe Putney*? According to the Court, the state-conferred power of hospital authorities to acquire hospitals did not "inherent[ly], logical[ly], or ordinar[ily] result" in the displacement of competition for two reasons. First, the Georgia law allowing hospital authorities to acquire hospitals, O.C.G.A. § 31-7-75(4), "is not principally concerned with hospital authorities' ability to acquire multiple hospitals and consolidate their operations" because it allows them to acquire other healthcare facilities as well. *Id.* at 232, 113 S. Ct. at 1014. So presumably many of the actions taken under § 31-7-75(4) would not relate to hospitals, let alone reduce competition in the market for hospital services. Second, "the power to acquire hospitals still does not ordinarily produce anticompetitive effects." *Id.* at 232, 113 S. Ct. at 1014. This is because the acquisition of a hospital by a hospital authority would significantly decrease competition "only in markets that are large enough to support more than one hospital but sufficiently small that the merger of competitors would lead to a significant increase in market concentration." *Id.* In other contexts—*e.g.*, the acquisition of a hospital authority's initial hospital or of one in a large hospital-services market like Atlanta—the acquisition of a new hospital doesn't significantly decrease competition.

12

Whatever the merits of the Court's new and improved clear-articulation requirement, it's hard to argue that the result in *Phoebe Putney* naturally follows from *Hallie* and *Omni*.[3] To illustrate the point, consider the facts of *Hallie*. Was the anticompetitive tying arrangement there the "inherent, logical, or ordinary result" of a pair of statutes authorizing the construction of sewage treatment facilities and the withholding of services from areas outside cities' limits? Probably not—most cities likely just constructed sewage-treatment facilities and limited their services to city residents. There's nothing "inherent[ly], logical[ly], or ordinar[ily]" anticompetitive about giving cities the ability to construct sewage facilities and the right to deny service to out-of-towners. But it was still *foreseeable*—albeit not in the sense that *Phoebe Putney* uses the term—that Eu Claire would use its sewage-services monopoly to gain leverage in another market. *See Hallie*, 471 U.S. at 42, 105 S. Ct. at 1718 ("[T]he statutes clearly contemplate that a city may engage in anticompetitive conduct. Such conduct is a *foreseeable result of empowering the City to refuse to serve unannexed areas*." (emphasis added)).

Nevertheless, *Phoebe Putney* is the law, and our job is to apply it to the facts of this case. Turning to those facts, it's hard to see much legally relevant daylight

---

[3] *See, e.g.*, Rebecca Haw Allensworth, *The New Antitrust Federalism*, 102 Va. L. Rev. 1387, 1406 (2016) (noting that "[t]he *Phoebe Putney* Court articulated a higher [clear-articulation] standard" than the Court had in previous cases).

13

between the conduct described in Diverse Power's complaint and the facts of

*Hallie*.  By state statute and constitution, Georgia municipal corporations have the

power "[t]o acquire . . ., to construct, to reconstruct, to improve, to better, and to

extend any water system or sewage system, or both, within the municipal

corporation."  O.C.G.A. § 36-34-5(a)(1).[4]  Also by state constitution, Georgia

cities may choose to deny water and sewer services to areas outside their corporate

limits.[5]  Georgia statutes even provide that "in the exercise of powers specifically

granted to them by law, local governing authorities of cities and counties are acting

pursuant to state policy," O.C.G.A. § 36-65-1, meaning that "in the exercise of

such powers, such local governing authorities shall be immune from antitrust

liability to the same degree and extent as enjoyed by the State of Georgia,"

O.C.G.A. § 36-65-2.

So for those keeping score at home, in both *Hallie* and the instant case a

state law empowered municipalities to develop a certain utility.  In both cases,

---

[4] *See also* Ga. Const. art. IX, § 2, para. 3(a)(7) ("[A]ny county, municipality, or any combination thereof may exercise the following powers and provide the following services: . . . [d]evelopment, storage, treatment, purification, and distribution of water.").

[5] *See* Ga. Const. art. IX, § 2, para. 3(b)(2) ("Unless otherwise provided by law, ... [n]o municipality may exercise any of the powers listed in subparagraph (a) of this Paragraph or provide any service listed therein [including "treatment, purification, and distribution of water," *see supra* note 4] outside its own boundaries except by contract with the county or municipality affected."); *Zepp v. Mayor of Athens*, 339 S.E.2d 576, 577 (Ga. 1986) ("A municipal corporation may not compel any person outside its territorial limits to accept water service which it undertakes to furnish, nor may the municipal authorities be compelled to render such service." (quoting *Barr v. City Council of Augusta*, 58 S.E.2d 823, 824–25 (Ga. 1950))).

another state law gave municipalities the right to refuse service to unannexed areas. And in both cases, the municipality foreseeably used those two powers to gain leverage in another market.[6]

There are two potential differences between *Hallie* and the instant case, but we don't think either difference is especially salient under these circumstances. First, the tied service here (natural gas) is arguably less related to water service than sewage-collection and -transportation services were to sewage treatment in *Hallie*. But monopolists tie products and services in unrelated markets all the time—that's kind of the point of a tying arrangement. So it would seem foreseeable that a monopolist would seek to leverage his monopoly in one market to increase his share of another.

Second, the statute in *Hallie* authorized the city to operate the typing service (sewage treatment) and the tied service (sewage collection and transportation). *See* Wis. Stat. § 66.076.[7] Here, in contrast, the relevant statute authorizes the city to operate the tying service (water), but is silent as to the tied service (natural gas). But this distinction does not affect the foreseeability of the anticompetitive

---

[6] The case for immunity is arguably stronger than in *Hallie* because O.C.G.A. § 36-65-1 and § 36-65-2 clearly express the legislature's intent that municipalities receive immunity when performing enumerated functions.

[7] Although that statutory provision has been amended and renumbered since *Hallie* was decided, the Wisconsin State Legislature website contains the text of the provision as it was then. *See* https://docs.legis.wisconsin.gov/1995/statutes/statutes/66/076; *see also* Br. for Petitioners, *Hallie*, 471 U.S. 34, 1984 WL 564126, at *30–31.

conduct. What makes the anticompetitive conduct foreseeable is the ability to deny services to unincorporated areas—not the number of services tied together. Besides, the Supreme Court did not rely on the fact that the statute authorized both services in its foreseeability analysis in *Hallie*, so it would be odd for us to endow that fact with dispositive impact now.

In any event, we're in a post-*Phoebe Putney* world. And in that world we have to ask not only whether the Georgia legislature could have foreseen that cities would use their water monopoly to increase their share of an unrelated market. We also have to ask if such an anticompetitive move is the "inherent, logical, or ordinary result" of the legislative scheme.

The answer to that question is no.

O.C.G.A. § 36-65-2 provides that "in the exercise of such powers [*i.e.*, the "powers specifically granted to them by law," O.C.G.A. § 36-65-1], . . . local governing authorities shall be immune from antitrust liability to the same degree and extent as enjoyed by the State of Georgia." If LaGrange is immune from federal antitrust liability, it is by virtue of this statute. The "power[] specifically granted to [LaGrange] by law" here is the power authorized by O.C.G.A. § 36-34-5(a)(3), which is the authority to operate water or sewage systems. LaGrange argues that so long as it's exercising a power granted by state law, its related anticompetitive actions are beyond federal antitrust liability. So it doesn't matter if

16

LaGrange conditions water service on the installation of natural-gas fixtures or the purchase of Goodyear tires. So long as the condition is connected to the "power specifically granted . . . by law," the entire arrangement is above board, immunity-wise.

We don't think this is the best reading of O.C.G.A. § 36-65-2, especially after *Phoebe Putney*. As the District Court recognized, the "exercise of such powers" referred to in O.C.G.A. § 36-65-2 (the immunity statute) refers here to the powers authorized in O.C.G.A. § 36-34-5(a)(3), the authority to operate water or sewage systems. And the immunity granted by O.C.G.A. § 36-34-5(a)(3)—in conjunction with O.C.G.A. § 36-65-2—is only immunity "[t]o operate and maintain any *such* systems," which is a reference to "water and sewage systems." Read together, these statute suggest that the Georgia legislature expressly "contemplate[ed] . . . municipal anticompetitive conduct" in the provision of water and sewage services. *McCallum v. City of Athens*, 976 F.3d 649, 655 (11th Cir. 1992). Accordingly, some actions directly connected to the provision of water and sewage services—*e.g.*, LaGrange's dividing up water-service territory with neighboring municipalities in Troup County, *see supra* page 2—are protected. *See McCallum*, 976 F.3d at 655. This is because market division and similar anticompetitive actions are the "inherent, logical, or ordinary result" of O.C.G.A. §§ 36-34-5(a)(3). But whatever the outer limits of *Phoebe Putney*'s "inherent,

17

logical, or ordinary" gloss, we think it is safe to say that the tying of an unrelated service in a different market to the provision of water service falls outside the statutes' grant of immunity.

Buttressing this interpretation is the astonishingly vast power LaGrange would have if we adopted its read of Georgia law. In its briefing and at oral argument, LaGrange contended that its actions are blanketed in state-action immunity whenever it exercises its water-utility power. The District Court rightly observed that there is "no limiting principle to this assertion" which, if true, "would [give LaGrange] immunity to take anticompetitive actions affecting *any* industry so long as the demand were made as a condition of refusing water service." *Diverse Power*, slip op. at 11–12. And our attempts to ferret out a limiting principle fared no better. *See* Oral Argument at 2:42–7:48, *Diverse Power, Inc. v. City of LaGrange*, ___ F.3d ___ (2019) (No. 18-11014), http://bit.ly/2YOksqM. We have a hard time believing that the Georgia legislature could have foreseen granting LaGrange powers so unlimited.

## IV.

The District Court correctly denied LaGrange's motion to dismiss for state-action immunity, the only issue we review in this interlocutory appeal. We accordingly affirm the District Court's judgment and remand the case for further proceedings.

18

**AFFIRMED and REMANDED.**