[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12227

_____

D.C. Docket No. 1:18-cv-02328-WMR

SMILEDIRECTCLUB, LLC,

Plaintiff–Appellee,

versus

TANJA D. BATTLE,
in her official capacity as Executive Director of
the Georgia Board of Dentistry,
et al.,

Defendants–Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 11, 2020)

Before JORDAN, TJOFLAT, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

SmileDirectClub, LLC, brought the instant suit against the Georgia Board of Dentistry, including the Board's members in their individual capacities, alleging *inter alia*, antitrust, Equal Protection, and Due Process violations.  Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Board members moved to dismiss SmileDirect's complaint, which the district court granted in part and denied in part. They now appeal the denial of their motion to dismiss the complaint with respect to the alleged antitrust violations.  After carefully reviewing the record, and with the benefit of oral argument, we affirm.  We conclude that, based on the facts alleged in SmileDirect's complaint, the Board members are not entitled to state-action immunity under *Parker v. Brown*, 317 U.S. 341 (1943), at this point in the litigation, and the district court properly denied their motion to dismiss.[1]

## I. BACKGROUND

For the purposes of our review at this stage, we accept all of the factual allegations in SmileDirect's complaint as true.

A.    SmileDirect and the Georgia Board of Dentistry

SmileDirect is a company that offers orthodontic treatments, like teeth alignment, to its customers at a steep discount.  It is able to afford that discount because, unlike most other orthodontists, it does not do in-person treatment.

---

[1]    The Court notes the contributions of the United States Federal Trade Commission, which participated in this case as *amicus curiae*.

Instead, its patients go to one of its locations—called "SmileShops"—located around the country, which are staffed by SmileDirect technicians.  At the "SmileShop," the technicians take digital scans of the patient's teeth, which are sent to SmileDirect's lab to create a model for treatment.

If the SmileDirect patient is in Georgia, the lab sends the model to a Georgia-licensed dentist or orthodontist for review.  The doctor "then identifies any periodontal disease, cavities, or any other oral conditions that require[] further investigation or which would prevent the patient from being a candidate for" SmileDirect's treatment.  Dist. Ct. Op. at 2.  If there are no such problems, the doctor creates a patient-specific plan, which culminates in a prescription for SmileDirect's "clear aligners."  The patient receives the aligners through the mail.

Enter the Georgia Board of Dentistry.  The Board is organized under Title 43, Chapter 11, of the Code of Georgia.  The Board is primarily made up of licensed, practicing dentists—along with one dental hygienist and one non-dental professional—who are appointed by the Governor.  O.C.G.A. § 43-11-2.  Thus, nine of the eleven current members of the Board are practicing dentists.  It has broad power to regulate "those acts, services, procedures, and practices which may be performed by dental hygienists, dental assistants, or other persons at the direction of and under the supervision of a licensed dentist."  *Id.* § 43-11-9.

3

On January 24, 2018, the Board voted to amend Rule 150-9-.02, which related to the "Expanded Duties of Dental Assistants." The proposed amendment added conducting "[d]igital scans for fabrication [of] orthodontic appliances and models" to the list of expanded duties of dental assistants, Ga. Bd. of Dentistry R. 150-9-.02(aa), which requires "direct supervision" by a dentist, *see id.* at 150-9-.01, .02. "Direct supervision and control as it pertains to a dental assistant shall mean that a dentist licensed in Georgia is in the dental office or treatment facility, personally diagnoses the condition to be treated, personally authorizes the procedures and remains in the dental office or treatment facility while the procedures are being performed by the dental assistant and, before dismissal of the patient, evaluates the performance of the dental assistant." *Id.* 150-9-.01(2). The practical effect of the proposed amendment would be to require that digital scans, like the ones conducted by SmileDirect at their "SmileShops," only take place when a licensed dentist is physically in the building where the scans are taking place, and to prohibit them otherwise.

The Board then sent the proposed amendment to Governor Nathan Deal, who was tasked with approving, modifying, or vetoing it. *See* O.C.G.A. § 43-1C-3. On April 30, 2018, he issued a "Certification of Active Supervision" to the Board, which "approve[d] the amendment to [the rule] for the purposes of active

4

supervision review required by § 43-1C-3." Mot. to Dismiss, Ex. 2. The second

paragraph of the Certification states:

> Georgia law grants the Board authority to promulgate rules and regulations related to dental assistant services. As such, the amendment adopted by the Board is within its authority as granted by clearly articulated state policy. Therefore, I hereby approve the amendment to [the dental regulations] for the purposes of active supervision review required by [state law].

*Id.*

### B.    The Instant Lawsuit

In response to the amendment to Rule 150-9-.02, SmileDirect filed the

instant lawsuit against the Georgia Board of Dentistry and its members,

challenging the amended rule. It alleged, *inter alia*, that the Board's actions in

amending the rule violated antitrust law, the Equal Protection Clause, and the Due

Process Clause; it also sought a declaratory judgment that taking digital scans did

not constitute the practice of dentistry such that the Board could lawfully regulate

it. In response, the Board moved to dismiss the complaint, pursuant to Rule

12(b)(6). The district court granted the motion and dismissed SmileDirect's claims

against the Board in its official capacity because of sovereign immunity, as well as

the claims against the Board members for compensatory damages. The district

court also dismissed SmileDirect's claim for declaratory judgment, holding that the

amended rule fell squarely within the practice of dentistry subject to the regulation

of the Board. However, the district court denied the motion with respect to the

5

antitrust, Equal Protection, and Due Process claims against the Board members in their individual capacities. The Board appeals only from the district court's denial of its motion to dismiss the antitrust claim.[2] Thus, SmileDirect's Equal Protection and Due Process claims against the Board members remain pending in the district court, and the only issue before this Court on appeal involves SmileDirect's antitrust claim and the district court's denial of the Board members' motion to dismiss it on the basis of state-action immunity under *Parker v. Brown*. The district court held "that SmileDirect's Sherman Act antitrust claim, as pleaded, is sufficient to survive a Rule 12(b)(6) motion to dismiss on *Parker* immunity grounds." Dist. Ct. Op. at 13.

## II. DISCUSSION

### A.    Jurisdiction

Before proceeding to the merits of this case, we have an "obligation to satisfy ourselves that we have jurisdiction" over this appeal. *See Boyd v. Homes of Legend, Inc.*, 188 F.3d 1294, 1297 (11th Cir. 1999). SmileDirect argues that we do not have jurisdiction to hear the Board's appeal of the (partial) denial of its motion to dismiss because it does not fit within the collateral-order doctrine.

---

[2]    The Board does not appeal from the district court's denial of its motion to dismiss with respect to the Equal Protection and Due Process claims.

It is, of course, generally the case that parties can only appeal final decisions of district courts.  *See* 28 U.S.C. § 1291.  However, as the Supreme Court recognized in *Cohen v. Beneficial Industrial Loan Corporation*,[3] "an otherwise nonappealable interlocutory order is appealable if it (1) 'conclusively determine[s] [a] disputed question,' (2) 'resolve[s] an important issue completely separate from the merits of the action,' and (3) '[is] effectively unreviewable on appeal from a final judgment.'"  *Freyre v. Chronister*, 910 F.3d 1371, 1378 (11th Cir. 2018) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)).

Pursuant to binding precedent in this Circuit, a district court's denial of a Rule 12(b)(6) motion to dismiss based on state-action immunity is immediately appealable under the collateral order doctrine.  *Diverse Power, Inc. v. City of LaGrange*, 934 F.3d 1270, 1272 & n.1 (11th Cir. 2019); *Commuter Transp. v. Hillsborough Cty.*, 801 F.2d 1286, 1289–90 (11th Cir. 1986).  *Diverse Power* held: "[S]tate-action immunity is a form of immunity from suit, not merely from liability.  And denials of immunity from suit—like denials of sovereign and qualified immunities—are immediately appealable under the collateral order doctrine."  934 F.3d at 1272 n.1 (citations omitted).[4]  Put another way, state-action

---

[3]     337 U.S. 541 (1949).

[4]     We cannot agree with our dissenting brother's position that the first prong of *Cohen* is absent.  Respectfully, we believe that the district court has conclusively determined a disputed question.  The district court expressly held "that SmileDirect's Sherman Act antitrust claim, as pleaded, is sufficient to survive a Rule 12(b)(6) motion to dismiss on *Parker* immunity grounds[.]"

Dist. Ct. Op. at 13.  And the district court's dispositive order expressly denied the Board members' motion to dismiss that claim.  *Id.* at 16 ("Defendants' Motion to Dismiss . . . is **DENIED** with respect to the claims in Counts II–IV [Count II being the antitrust claim] against the Board member defendants.").  Thus, the district court rejected the Board members' legal arguments that they were entitled to state-action immunity as a matter of law.  That the district court acknowledged the fact that the ultimate determination of the Board members' entitlement to immunity would have to await "further factual developments" later in the litigation does not nullify the district court's holding that SmileDirect's claim, as pleaded, survives the immunity defense.  *See Commuter Transp.*, 801 F.2d at 1289 (holding that a summary judgment decision rejecting a claim of state-action immunity "is 'conclusive' even if it is based on the existence of potential fact issues").

As noted in the text, binding precedent in *Diverse Power* and *Commuter Transportation* holds that state-action immunity is immunity from suit—not merely immunity from liability. There is established law detailing the significance of immunity from suit, as distinguished from immunity from liability.  As the Supreme Court said in *Behrens v. Pelletier*:

> *Harlow* and *Mitchell* make clear that the defense is meant to give government officials a right, not merely to avoid "standing trial," but also to avoid the burdens of "such *pretrial* matters as discovery . . . , as 'inquiries of this kind can be peculiarly disruptive of effective government.'" *Mitchell*, *supra*, at 526 (emphasis added) (quoting from *Harlow*, *supra*, at 817). Whether or not a later summary judgment motion is granted, denial of a motion to dismiss is conclusive as to this right. . . . [T]his right is important enough to support an immediate appeal.

516 U.S. 299, 308 (1996); *see also Brown v. Crawford Cty., Ga.*, 960 F.2d 1002, 1011 (11th Cir. 1992) (noting the significance of immunity from suit, we held: "[t]o preserve its purpose, 'entitlement to absolute immunity must be determined as early as possible' and appropriately on a motion to dismiss or judgment on the pleadings") (quoting from *Marx v. Gumbinner*, 855 F.2d 783, 788 (11th Cir. 1988)).

Thus, if the Board members' legal arguments at this early stage had been sound, they would have been entitled to dismissal now, without having to engage in discovery and further litigation. After a litigant's immunity defense is denied at an early stage, the caselaw recognizes that the facts may change after further factual development, and at a later stage in the litigation, the party may assert again its immunity defense.  *See Behrens*, 516 U.S. at 309, 116 S. Ct. at 840 ("[R]esolution of the immunity question may require more than one judiciously timed appeal, because the legally relevant factors bearing upon the *Harlow* question will be different on summary judgment than on an earlier motion to dismiss.") (internal quotation omitted).

We also disagree with the dissent's suggestion that our decision is merely a hypothetical, advisory opinion.  Although it is true that our decision does not resolve the issue of the Board members' ultimate entitlement to state-action immunity, our decision does definitively resolve the legal issues the Board members have presented at this stage.  Our decision does definitively reject two legal arguments asserted by the Board members: First, their argument that they are entitled to *ipso facto* immunity merely because the Governor approved the Board's rule under Georgia's

8

immunity is "comparable to" qualified immunity for the purposes of applying the *Cohen* doctrine. *Commuter Transp.,* 801 F.2d at 1289. Accordingly, we conclude that we have jurisdiction of the Board members' appeal of the denial of its motion to dismiss because it implicates immunity from suit under the state-action doctrine.

SmileDirect's argument that private parties—and it asserts that the individual members of the Board members are private parties—are not entitled to immediately appeal under the collateral-order doctrine is at odds with our precedent. *See Praxair, Inc. v. Fla. Power & Light*, 64 F.3d 609, 611 (11th Cir. 1995). In *Praxair*, we held that there was "collateral order appellate jurisdiction of the appeals of Florida Power and Florida Power & Light" because the denial of state-action immunity is immediately appealable. *See id.* Although *Praxair* also involved an automatic appeal under 28 U.S.C. § 1292(b), we nonetheless conclude that it held, as a binding alternative holding, that private parties are entitled to appeal the denial of state-action immunity under the collateral-order doctrine.

---

statutory framework that vests in the Governor the power, authority, and duty to substantively review, approve, modify, or veto the rule, notwithstanding whether the Governor has actually exercised his powers and discharged his duties; and second, their argument that the "active supervision" prong (of the applicable analysis where the board is dominated by market participants) is satisfied because of the Governor's approval of the rule in light of that statutory framework, again notwithstanding whether the Governor has actually exercised his statutory powers and discharged his duties.

For the foregoing reasons, we conclude that we do have appellate jurisdiction under the collateral order doctrine. Accordingly, we proceed to the merits of this case.

B.    State-Action Immunity

We review the district court's ruling on a motion to dismiss *de novo*. *Paez v. Mulvey*, 915 F.3d 1276, 1292 (11th Cir. 2019). A motion to dismiss is properly denied if, taking the allegations in the plaintiff's complaint as true, the plaintiff makes out a claim "that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Sherman Antitrust Act of 1890 makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or [interstate] commerce." 15 U.S.C. § 1. However, in *Parker v. Brown*, the Supreme Court explained that the Sherman Act does not apply to state action—"it must be taken to be a prohibition of individual and not state action." 317 U.S. at 352. This exemption from antitrust liability does not extend to allowing states to "give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful[.]" *Id.* at 351.

Determining the existence of "state action"—that is, actors claiming that they are acting as the state and thus are immune from suit—requires a context-specific analysis. That a defendant in an antitrust case is technically a state board,

10

agency, or commission is not dispositive of the ultimate question. "The similarities between agencies controlled by active market participants and private trade associations are not eliminated simply because the former are given a formal designation by the State, vested with a measure of government power, and required to follow some procedural rules. *Parker* immunity does not derive from nomenclature alone." *N.C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 511 (2014) (hereinafter *Dental Examiners*). Addressing a case involving the North Carolina State Board of Dental Examiners—a state board charged with regulating the practice of dentistry and composed of a majority of board members who are engaged in the active practice of the profession it regulates, precisely like the Georgia Board of Dentistry in this case—the Supreme Court in *Dental Examiners* held:

> When a State empowers a group of active market participants to decide who can participate in its market, and on what terms, the need for supervision is manifest. The Court holds today that a state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates must satisfy *Midcal*'s active supervision requirement in order to invoke state-action antitrust immunity.[5]

*Id.* at 511–12.

---

[5]    The parties in *Dental Examiners* and the Court assumed that the clear articulation requirement of *Midcal* was satisfied. 574 U.S. at 504.

Accordingly, we turn to what is commonly known as the *Midcal* test—a two-prong analysis synthesized by the Supreme Court in *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980). In *Midcal*, the Supreme Court explained that, under *Parker v. Brown*, there are "two standards for antitrust immunity." *Id.* "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." *Id.* (quoting *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 410 (1978)). As noted above, the Supreme Court in *Dental Examiners* recently explained that "a state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates must satisfy *Midcal*'s active supervision requirement in order to invoke state-action antitrust immunity." *Dental Examiners*, 574 U.S. at 511–12.

However, the *Midcal* test is not applied in all instances in which state-action immunity is invoked. The actions of a "state sovereign" are, *ipso facto*, "exempt from the operation of the antitrust laws." *Hoover v. Ronwin*, 466 U.S. 558, 568 (1984). In such a case, the *Midcal* test is not conducted and state-action immunity applies automatically. *See id.* The Supreme Court has applied *ipso facto* state-action immunity in only limited cases—to the actions of a "state legislature adopt[ing] legislation" or "a decision of a state supreme court, acting legislatively

12

rather than judicially[,]" *id.*, and only where the conduct challenged "was in reality that of" the sovereign itself, *see id.* at 573.

We first address whether, on the basis of the facts we assume in this Rule 12(b)(6) posture, the Board members have satisfied the *Midcal* test. Because we conclude below that the Board members have failed to satisfy the "active supervision" prong, and because satisfaction of both prongs is necessary, we conclude that the Board members have failed to satisfy the *Midcal* test, and we need not address the clear articulation prong. We then proceed to consider, and ultimately reject, the Board's argument that it is entitled to *ipso facto* immunity.

### 1.    The *Midcal* Test

As explained previously, the *Midcal* test synthesized the Supreme Court's past state-action immunity caselaw into two discrete requirements. For state-action immunity to apply (aside from *ipso facto* immunity where the sovereign itself has acted), the challenged market restraint must be (1) "clearly articulated and affirmatively expressed as state policy," and (2) "actively supervised by the State itself." 445 U.S. at 105 (citations and quotations omitted).

### a.    Clear Articulation

Most litigation with respect to the satisfaction of the *Midcal* test concerns the second prong—the presence of "active supervision." The absence of "active supervision" is dispositive, and courts need not consider the "clear articulation"

13

prong where "active supervision" is absent. *Patrick v. Burget*, 486 U.S. 94, 100 (1988). Because we conclude below that the Board members have failed to satisfy the "active supervision" prong, we decline to address the clear articulation prong.

### b. Active Supervision

We turn to the second prong of the *Midcal* analysis, which asks whether the amendment to Rule 150-9-.02 was "actively supervised by the State." *Midcal*, 445 U.S. at 105. The "active supervision" prong

> mandates that the State exercise ultimate control over the challenged anticompetitive conduct. The mere presence of some state involvement or monitoring does not suffice. The active supervision prong of the *Midcal* test requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy. Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests.

*Patrick*, 486 U.S. at 101 (citations omitted). "[T]he purpose of the active supervision is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices. Its purpose is to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties. . . . [T]he analysis asks whether the State has played a substantial role in determining the specifics of the economic policy. The question is not how well the regulation works, but

14

whether the anticompetitive scheme is the State's own." *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 634–35 (1992).

This is not an inquiry conducted in the abstract. The "Court has identified only a few constant requirements of active supervision":

> The supervisor must review the substance of the anticompetitive decision, not merely the procedures followed to produce it, *see Patrick*, 486 U.S., at 102–03; the supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy, *see ibid.*; and the "mere potential for state supervision is not an adequate substitute for a decision by the State," *Ticor*, [504 U.S.] at 638. Further, the state supervisor may not itself be an active market participant. In general, however, the adequacy of supervision otherwise will depend on all the circumstances of a case.

*Dental Examiners*, 574 U.S. at 515.

The Supreme Court's opinion in *Ticor* helps illustrate the application of these principles. *Ticor* concerned the permissibility, under antitrust law, of the defendant insurance companies' setting of rates for title search and examination services, which applied in multiple states. The Third Circuit concluded that the State of Wisconsin's Insurance Department had actively supervised the insurance companies' setting of these rates. *Ticor Title Ins. Co. v. FTC*, 922 F.2d 1122, 1139–40 (3d Cir. 1991). Specifically, the court determined that "Wisconsin had the power to regulate Ticor's collective filing of rates for title search and examination services" and that it had exercised that power. *Id.* It based its conclusion that Wisconsin had exercised its power on the fact that "Wisconsin's

15

program of supervision was in place during the relevant time and that it was staffed and funded," and that the Department "demonstrated some basic level of activity directed towards seeing that Ticor carried out the state's policy and not simply its own policy." *Id.* at 1140.

But the Supreme Court concluded that this was insufficient and reversed the Third Circuit's decision. "Where prices or rates are set as an initial matter by private parties, subject only to a veto *if the State chooses to exercise it*, the party claiming the immunity must show that state officials have undertaken the necessary steps to determine the specifics of the price-fixing or ratesetting scheme. *The mere potential for state supervision is not an adequate substitute for a decision by the State*." *Ticor*, 504 U.S. at 638 (emphasis added). The administrative law judge in the case found that, in Wisconsin, "at most the rate filings were checked for mathematical accuracy," and some "were unchecked altogether." *Id.* Despite the state law requirement that the State Insurance Commissioner "examine the rating bureau at regular intervals" and its "authoriz[ation] to reject rates through a process of hearings," it did neither. *Id.* at 630. And, the Court's later decision in *Dental Examiners* held that *Ticor*'s holding that the "mere potential for state supervision is not an adequate substitute" also applied in the context of regulation by a dentistry board the composition of which was substantially identical to the Georgia Board of Dentistry in this case.

16

We believe that similar dynamics are at play here. Though the Governor of Georgia had the "authority and duty to actively supervise" and was clearly empowered to "approve, remand, modify or reverse" proposed rules (or amendments), O.C.G.A. § 43-1C-3, he did not exercise that power here. There is no indication that the Governor engaged in a substantive review of the amended rule to ensure that it accords with state policy. His comments regarding the proposed amendment in the Certification of Active Supervision suggest that he examined only the procedural question of whether the amended rule was within the Board of Dentistry's statutory power to propose the rule change. The Governor did not comment—even in passing—on the merits or substance of the rule change. Quite the contrary. The reasonable inferences from his Certification indicate that he ascertained that the amendment was within the authority delegated to the Board by the Georgia statute, and the Governor then concluded: "Therefore, I hereby approve the amendment." This is the exact sort of *potential* for active supervision—without *actual* supervision—that the Supreme Court has repeatedly held is insufficient to satisfy the active supervision requirement. *See Dental Examiners*, 574 U.S. at 515 ("mere potential for state supervision is not an adequate substitute" (quoting *Ticor*, 504 U.S. at 638)); *Patrick*, 486 U.S. at 101, 105 ("The active supervision prong of the *Midcal* test requires that state officials have and exercise power to review particular anticompetitive acts of private parties

17

and disapprove those that fail to accord with state policy," and the mere assurance that reasonable procedures were used without a "review [of] the merits of a [challenged] decision to determine whether it accorded with state regulatory policy . . . does not convert the action of a private party . . . into the action of the state for purposes of the state-action doctrine.").

Accordingly, accepting the reasonable inferences from the allegations of SmileDirect's complaint, and the Governor's certification to which it refers, we conclude that the Board has not satisfied the active supervision requirement for entitlement to state-action immunity.[6]

### 2.    *Ipso Facto* Immunity

In addition to its argument that it complied with the *Midcal* test, the Board members argue that they are exempt from that test altogether.  They argue that they are entitled to *ipso facto* immunity because the Board of Dentistry's amendment to Rule 150-9-.02 can be attributed to the Governor of Georgia.  Specifically, they argue that Georgia's statutory framework for rulemaking grants the Governor both the authority and power to substantively review any rule promulgated by a

---

[6]    Of course, upon the initiation of discovery, the Board members may be able to produce evidence of Governor Deal's substantive consideration of the proposed amendment.  Our comments on the Board's compliance with the *Midcal* test only applies to the facts which we assume in this Rule 12(b)(6) posture.

18

professional board, like the Board of Dentistry, and indeed imposes upon him the *duty* to do so.

The Board members argue that, in this case, then-Governor Nathan Deal, who issued a Certification of Active Supervision approving the amendment to Rule 150-9-.02, reviewed the amendment and approved it. They argue that the challenged conduct—the amended rule—is attributed to him, and not the Board itself. We read the Board members' argument as one essentially arguing that, without regard to whether the Governor *actually* exercised his power to substantively review a rule, the mere power, authority, and duty to do so is sufficient to invoke state-action immunity *ipso facto*. Stated more concisely, the Board's position is that the mere potential for such action by the Governor is sufficient without regard to whether the Governor actually reviews the rule substantively and makes it his own action. We reject that argument; we believe it is inconsistent with Supreme Court case law.

We will assume, *arguendo*, but expressly do not decide, that the executive action of a governor could qualify for *ipso facto* state-action immunity.[7] We also assume, *arguendo*, that the Georgia General Assembly actually granted the

---

[7]    Neither the Supreme Court, *Ronwin*, 466 U.S. at 568 n.17, nor the Eleventh Circuit has decided whether the executive action of a governor could qualify for state action immunity under appropriate factual circumstances. We need not address that issue today.

19

Governor the kind of power, authority, and duty to substantively review proposed rules such that they are attributable to him.[8]  Nonetheless, even making these assumptions, the Board members' argument is ultimately without merit.

In evaluating *ipso facto* immunity, we review the Supreme Court's limited jurisprudence on the subject.  The cases in which the Supreme Court has employed *ipso facto* state-action immunity involve situations as in *Hoover v. Ronwin*, *supra*.  There, Ronwin was an unsuccessful candidate for admission to the Bar of Arizona.  The Arizona Constitution vested authority in the Arizona Supreme Court to determine admissions to the Bar.  Arizona Supreme Court rules delegated to a committee the tasks of designing a grading or scoring system, submitting same to the Court before the examination, grading the exams and submitting to the Court its recommendations with respect to admission to the Bar.  Only the Court had authority to admit or deny, and any applicant was entitled to individualized review by filing a petition directly with the Court.  Ronwin did petition the Court challenging, *inter alia*, the grading or scoring formula.  The Court denied his petition.  Ronwin later sued the members of the Committee in federal district court, challenging that same grading or scoring formula, which he claimed is an

---

[8]    SmileDirect makes a forceful argument that the Georgia legislation delegates the rule-making authority to the Board, and intended only to give the Governor sufficient authority to satisfy *Midcal*'s active supervision prong.  In light of our decision today, we need not decide the scope of the authority actually delegated to the Governor.

anticompetitive action to reduce the number of competing attorneys. The Ninth Circuit construed the district court as having dismissed Ronwin's complaint pursuant to Rule 12(b)(6) on the basis of state-action immunity. The Ninth Circuit reversed, holding that the mere fact the members of the Committee were appointed by the Arizona Supreme Court was insufficient to confer state-action immunity.

The Supreme Court granted certiorari. In its opinion, the Court noted that "[c]loser analysis is required when the activity at issue is not directly that of the legislature or supreme court, but is carried out by others pursuant to state authorization." *Ronwin*, 466 U.S. at 568. The Court also noted the *Midcal* line of cases, and noted that its two-step analysis—clear articulation of state policy and active supervision—is applicable when the challenged anticompetitive conduct is that of a non-sovereign state actor. *Id.* at 568–69. However, the Court held that where the challenged anticompetitive conduct is that of the sovereign itself, it is not necessary to address the issues of "clear articulation" and "active supervision." *Id.* at 569. Thus, the issue was whether the challenged conduct was in reality that of the Arizona Supreme Court. *Id.* The Court emphasized the fact that Ronwin had taken full advantage of the rules and petitioned for individualized review in the Arizona Supreme Court, challenging the grading formula, *id.* at 564 & n.11, 573 & n.23; and the fact that the state supreme court heard and denied his petition, including his claim that the grading formula violated the Sherman Act, *id.* at 564 &

21

n.11, 573 & n.23.  The Court held that the Arizona Supreme Court had the "sole authority to determine who should be admitted," and had "itself approved the particular grading formula," *id.* at 573, which was the conduct challenged by Ronwin.  Thus, the Court concluded that "the conduct that Ronwin challenges was in reality that of the Arizona Supreme Court."  *Id.*

The Court's decision in *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977), also applied *ipso facto* state-action immunity on facts virtually indistinguishable from those in *Ronwin*.  There, Bates challenged as anticompetitive his suspension from the practice of law imposed because of his violation of a disciplinary rule of the Supreme Court of Arizona restricting advertising by lawyers.   Although the disciplinary complaint was initially heard by the Bar committee, Bates sought review in the Arizona Supreme Court, challenging the rule as a violation of the Sherman Act.  The Arizona Supreme Court heard his challenge and rejected it.  *Id.* at 356.  Bates appealed to the United States Supreme Court.  Again emphasizing that the Arizona Supreme Court adopted the challenged rule and was the "ultimate trier of fact and law in the enforcement process," *id.* at 361, the Court held that state-action immunity was available.

The *Ronwin* Court's holding—"the conduct that Ronwin challenges was in reality that of the Arizona Supreme Court"—was expressly based on the *Bates* decision.  *Ronwin*, 466 U.S. at 573.  The *Bates* opinion illustrates that *ipso facto*

22

state-action immunity is available only if the anticompetitive conduct challenged is "in reality" the action of the sovereign itself.  In distinguishing its previous decision in *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975), the Court in *Bates* held:

> This Court concluded that the action was not protected, emphasizing that "we need not inquire further into the state-action question because it cannot fairly be said that the State of Virginia through its Supreme Court Rules required the anticompetitive activities of either respondent."  In the instant case, by contrast, the challenged restraint is the *affirmative command of the Arizona Supreme Court*.

*Bates*, 433 U.S. at 359–60 (emphasis added).

The argument of the Board members—that the power, authority and duty vested in the Governor to adopt and make his own the challenged anticompetitive action of the Board is sufficient for *ipso facto* state-action immunity, without regard to whether or not the Governor actually exercises that authority—is inconsistent with *Ronwin*, *Bates* and *Goldfarb*.  Even assuming *arguendo* such power and duty vested in the Governor, we cannot conclude that one could fairly say that the anticompetitive conduct challenged here (*i.e.*, the amended rule) was "in reality" the act of Governor Nathan Deal.

Whatever the Governor's power and duty with respect to the amended rule, if he does not exercise same and does not actually make the amended rule his own "affirmative command," his actions fall short of the actions of the Arizona Supreme Court in *Ronwin* and *Bates* where the challenged anticompetitive conduct

23

was actually the conduct of the sovereign actor—i.e., approving and enforcing the challenged grading formula (in *Ronwin*), or promulgating the challenged rule and enforcing the violation thereof (in *Bates*), in both cases after an individualized hearing on the challenge by the Arizona Supreme Court.  *See Dental Examiners*, 574 U.S. at 504 (suggesting that *ipso facto* state-action immunity is available only when the challenged conduct is "an undoubted exercise of state sovereign authority").

The argument of the Board members is also inconsistent with the Court's decisions in *Dental Examiners* and *Ticor*. Even in the context of describing the kind of sovereign action necessary to satisfy the "active supervision" prong of *Midcal*, both *Dental Examiners* and *Ticor* held that the "mere potential for state supervision is not an adequate substitute for a decision by the State."  *Dental Examiners*, 574 U.S. at 515 (quoting *Ticor*, 504 U.S. at 638); *see also Patrick*, 486 U.S. at 101 ("The active supervision prong of the *Midcal* test requires that state officials have *and exercise* power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy.") (emphasis added).  It would make no sense to suppose, as the Board members do, that the mere power and duty on the part of the Governor would suffice for *ipso facto* immunity, when clearly established Supreme Court case law makes it clear that mere potential supervision is not even sufficient to satisfy the "active

24

supervision" prong of *Midcal*.  In other words, given that *ipso facto* immunity serves to entirely immunize an actor from antitrust litigation without the rigorous, fact-sensitive scrutiny articulated in the *Midcal* test, it would make no sense to apply a *lower* standard with respect to *ipso facto* immunity than is required to satisfy the *Midcal* test.

For the foregoing reasons, we reject the Board members' argument that *ipso facto* state-action immunity is available merely because of the Governor's power and duty, and without regard to his actual exercise thereof.  We held above—in our discussion of the "active supervision" prong—that, on the basis of the facts we must assume in this Rule 12(b)(6) posture, the Board members have established no more than the mere potential for active supervision on the part of the Governor.  Accordingly, it follows that the Board members have fallen far short of establishing that the amended rule was "in reality" the action of the Governor.  We hold that the Board members are not entitled to *ipso facto* state-action immunity at this stage of the litigation.

## III. CONCLUSION

25

For the foregoing reasons, we conclude that the district court properly denied the Board members' motion to dismiss with respect to SmileDirect's antitrust claims.[9]

**AFFIRMED.**

---

[9] We decline to address other arguments of the parties not addressed in this opinion, the resolution of which is not necessary for us to conclude at this stage of the litigation that the district court correctly denied the Board members' motion to dismiss.

JORDAN, Circuit Judge, concurring:

Our cases hold that the denial of state-action antitrust immunity is immediately appealable under the collateral order doctrine, not only by the state but by private parties as well. *See, e.g., Commuter Transportation Systems, Inc. v. Hillsborough County Aviation Authority*, 801 F.2d 1286 (11th Cir. 1986); *Praxair, Inc. v. Florida Power & Light Co.*, 64 F.3d 609, 611 (11th Cir. 1995). In my view, our precedent on this issue is mistaken and should be re-examined in an appropriate case by the full court.

The Supreme Court first recognized what is frequently referred to as state-action immunity in *Parker v. Brown*, 317 U.S. 341, 350–52 (1943), holding that the Sherman Act does not reach anticompetitive conduct by the state or its officers or agents. Over time, the Supreme Court extended *Parker* protection, in appropriate circumstances, to municipalities and private parties. *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 38–39 (1985) (municipalities); *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 104–06 (1980) (private parties).

*Parker* held only that the Sherman Act does not reach state action, not that it cannot do so. *See Parker*, 317 U.S. at 350–51 ("We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save

27

only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress."). State-action antitrust "immunity" therefore arose from an interpretation of the Sherman Act's scope, not from a constitutional (or common-law) right to avoid trial, and not out of concern about special harms that might result from litigation. *See S.C. St. Bd. of Dentistry v. FTC*, 455 F.3d 436, 444–45 (4th Cir. 2006). As a number of our sister circuits have explained, *Parker* "immunity" is more like a defense to a cause of action than an entitlement to avoid suit completely. *See id.*; *Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287, 292 n.3, 294 (5th Cir. 2000). The denial of state-action immunity, therefore, is not "effectively unreviewable" on appeal, and a party made to postpone its arguments until final judgment may still invoke the protections of *Parker. See, e.g., SolarCity Corp. v. Salt River Project Agricultural & Power District*, 859 F.3d 720, 726–27 (9th Cir. 2017); *S.C. St. Bd. of Dentistry*, 455 F.3d at 444–45; *Huron Valley Hosp. v. City of Pontiac*, 792 F.2d 563, 567 (6th Cir. 1986). *Contra Martin v. Memorial Hospital at Gulfport*, 86 F.3d 1391, 1394 (5th Cir. 1996); 1A Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 222b (4th ed. 2013).

Even if we assume that a state is able to immediately appeal the denial of *Parker* immunity, an interlocutory appeal should not be available to private parties like the members of the Georgia Board of Dentistry, whose status does not implicate

28

sovereignty concerns.  *See Auraria Student Hous. v. Campus Village*, 703 F.3d 1147, 1151 (10th Cir. 2013); *Acoustic Sys.*, 207 F.3d at 293–94; Jason Kornmehl, *State Action on Appeal: Parker Immunity and the Collateral Order Doctrine in Antitrust Litigation*, 39 Seattle U. L. Rev. 1, 32 (2015). As the Fifth Circuit concluded in *Acoustic Systems*, the concerns that might animate the need for an immediate appeal by a state—for example, sparing the state the burdens and uncertainties of litigation—are "not raised by a suit against a private party."  207 F.3d at 294.  Indeed, insofar as private parties are concerned, *Parker* "provides only a defense to liability." *Id.*

Our decision in *Praxair, Inc.*, 64 F.3d at 611, which allowed a private party to take an immediate appeal from the denial of *Parker* immunity, contains no analysis whatsoever.  It is therefore not surprising that we stand alone among the circuits in holding that a private party may take an interlocutory appeal of the denial of *Parker* immunity.  *See Auraria Student Hous.*, 703 F.3d at 1151 (describing the lopsided circuit split).

There is, moreover, another reason why private parties should not be able to immediately appeal the denial of *Parker* imunity.  The collateral order doctrine "is a practical construction" of the general rule that parties may only appeal final decisions of a district court.  *See Dig. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546

29

(1940)).    To come within the "small class" of interlocutory orders that are immediately appealable under *Cohen*, an order must (1) conclusively determine the disputed question, (2) be effectively unreviewable on appeal after trial, and (3) resolve an important issue completely separate from the merits of the action. *See Cohen*, 337 U.S. at 545–46.   The Supreme Court has repeatedly stressed that very few interlocutory orders will meet these three stringent conditions.   *See Will v. Hallock*, 546 U.S. 345, 958 (2006) ("[W]e have not mentioned applying the collateral order doctrine recently without emphasizing its modest scope.").

Where, as here, private parties are concerned, the matter of *Parker* immunity is not completely separate from the merits.   That is because the Supreme Court requires private parties to satisfy the "clear articulation" and "active supervision" requirements, as set out in *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980), and its progeny.   *See* Christopher J. Reid, *Appealability of State Action Immunity: Navigating Federal Courts Past the Crossroads Where Parker Immunity Meets the Collateral Order Doctrine*, 52 Suffolk L. Rev. 157, 180–82, 184–85 (2019).   Given these requirements, it is difficult, if not impossible, to separate the *Parker* immunity of a private party from the merits.

With these thoughts, I join the majority opinion in full.

30

TJOFLAT, Circuit Judge, dissenting:

The majority concludes that we have jurisdiction to hear this interlocutory appeal of the District Court's order, which denied the Georgia Board of Dentistry members' Rule 12(b)(6) motion to dismiss, because it implicates the Board members' entitlement to immunity from suit under the state-action doctrine established by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S. Ct. 307 (1943). *See ante* at 7–9. That would be right *if* the District Court held that the Board members weren't entitled to immunity and denied their motion to dismiss on that ground. But the District Court rendered no decision on the Board members' entitlement to state-action immunity. Instead, it reserved that question for consideration at the summary-judgment stage, after much-needed development of the factual record through discovery. As such, any decision by this Court on the Board members' entitlement to state-action immunity at this stage of the litigation would be merely provisional—or, in the words of the District Court, "premature." Because we lack both statutory and constitutional jurisdiction to issue hypothetical decisions on appeal, I respectfully dissent.

31

I.

The Courts of Appeals generally have jurisdiction to hear appeals only of a

district court's final decision.  28 U.S.C. § 1291.[1]  But in *Cohen v. Beneficial*

*Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S. Ct. 1221, 1225–26 (1949), the

Supreme Court carved out as a narrow exception to this general rule a small class

of orders "which finally determine claims of right separable from, and collateral to,

rights asserted in the action, too important to be denied review and too independent

of the cause itself to require that appellate consideration be deferred until the whole

case is adjudicated."  Accordingly, under *Cohen*, we have jurisdiction to review an

otherwise nonappealable interlocutory order only if it "(1) conclusively determines

a disputed question, (2) resolves an important issue completely separate from the

merits of the action, and (3) is effectively unreviewable on appeal from a final

judgment."  *Freyre v. Chronister*, 910 F.3d 1371, 1378 (11th Cir. 2018)

(alterations adopted) (quotations omitted).  The Supreme Court has repeatedly

stressed that each prong of the *Cohen* test is stringent, and that the collateral-order

doctrine must "never be allowed to swallow the general rule that a party is entitled

to a single appeal, to be deferred until final judgment has been entered."  *Mohawk*

---

[1] We also have jurisdiction over certain interlocutory orders that the district court has specifically certified for appeal, where "such order involves a controlling question of law as to which there is substantial ground for difference of opinion and . . . an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  Tellingly, the District Court here denied the Board members' request to certify its order for interlocutory appeal under § 1292(b).

*Indus., Inc. v. Carpenter*, 558 U.S. 100, 106, 130 S. Ct. 599, 605 (2009) (quoting

*Dig. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868, 114 S. Ct. 1992,

1996 (1994)); *Will v. Hallock*, 546 U.S. 345, 349–50, 126 S. Ct. 952, 957–58

(2006).

This appeal fails the first prong of *Cohen*'s collateral-order doctrine because

the District Court never conclusively determined that the Board members could not

avail themselves of *Parker* state-action immunity.    To understand why, it is

necessary to lay out the District Court's entire analysis of the *Parker* immunity issue.

The District Court first held that SmileDirect's complaint sufficiently alleged that

the Board members engaged in concerted action to unreasonably restrain trade, and

thus that the complaint adequately stated a federal antitrust claim under the Sherman

Act so as to survive a motion to dismiss under Rule 12(b)(6).    Dist. Ct. Op. at 10–

11.  Then, turning to the defense of state-action immunity, the District Court held:

> [T]he Complaint reveals a well-pleaded factual dispute that is not resolved by the Certification of Active Supervision. *Only discovery will determine* whether the Board provided all relevant information to the Governor, whether the proposed amendment was subjected to any meaningful review by the Governor, or whether the Certification of Active Supervision was merely "rubberstamped" as a matter of course. See Patrick v. Burget, 486 U.S. 94, 101 (1988) ("[t]he mere presence of some state involvement or monitoring does not suffice" to meet the active supervision requirement).
>
> Accordingly, *the Court finds that a definitive ruling on Parker immunity would be premature at this stage*, that SmileDirect's Sherman Act antitrust claim, as pleaded, is sufficient to survive a Rule 12(b)(6) motion to dismiss on Parker immunity grounds, and that *further factual development is required to determine whether the Board members are*

*entitled to Parker immunity. The Board members may therefore raise the Parker immunity defense at a later stage in this litigation, such as in a motion for summary judgment*, if appropriate.

*Id.* at 13 (footnote omitted) (emphases added).

The majority's cursory reference to the District Court's opinion treats the District Court as having denied the Board members' Rule 12(b)(6) motion to dismiss based on a determination that the Board members are not entitled to state-action immunity. *See ante* at 6. But as the full text of the District Court's opinion reveals, the Court explicitly reserved ruling on the Board members' motion to dismiss based on the state-action-immunity defense.[2] It found merely that the Board members' entitlement to state-action immunity was not apparent on the face of the complaint, which included only a single paragraph (out of 113) that could support immunity at this stage: that the Georgia Governor had signed a Certification of Active Supervision.[3] Finding simply that SmileDirect had not pled

---

[2] The majority points to the last page of the District Court's opinion, which states "Defendants' Motion to Dismiss . . . is **DENIED**" with respect to the antitrust claim in Count II. *See id.* at 7–8 n.4 (quoting Dist. Ct. Op. at 16). But, based on the District Court's *analysis*, it is clear that that order refers to the District Court's conclusion that, as an initial matter, SmileDirect adequately stated an antitrust claim—i.e., that the complaint sufficiently alleged concerted action to unreasonably restrain trade. *See* Dist. Ct. Op. at 10–11. Its denial of the Board members' motion to dismiss has nothing to do with the Board members' affirmative defense, which is a separate question. That the District Court's denial of the Board members' motion to dismiss relates only to whether SmileDirect stated an antitrust *claim*—as opposed to the sufficiency of the Board members' affirmative defense—makes sense, since the sole purpose of Rule 12(b)(6) is to assess whether the complaint has sufficiently stated a claim for relief.

[3] I can't understand why SmileDirect chose to include this allegation in its complaint. It certainly wasn't necessary to state an antitrust claim under the Sherman Act, 15 U.S.C. § 1. *See, e.g.*, *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (en banc) ("[Section] 1 prohibits (1) conspiracies that (2) unreasonably (3) restrain interstate or foreign trade."). As the District Court observed, SmileDirect's complaint

34

itself out of court, the District Court decided that it would take up the *Parker* issue at a later stage of the litigation, after the Board members answered the complaint and the parties had the opportunity to conduct discovery on SmileDirect's claims and, importantly, the Board members' defenses. Thus, there simply is no "fully consummated decision" regarding the Board members' entitlement to state-action immunity—no "complete, formal, and . . . final rejection" of the immunity defense—which we can review at this stage of the litigation. *See Abney v. United States*, 431 U.S. 651, 659, 97 S. Ct. 2034, 2040 (1977).

This is not to say that this Court could *never* have collateral-order jurisdiction to review a district court's denial of state-action immunity at the motion-to-dismiss stage *when the district court in fact makes such a conclusive determination*. Indeed, we held in *Diverse Power, Inc. v. City of LaGrange* that this Court does have jurisdiction under the collateral-order doctrine to review a

---

sufficiently alleged that the Board members engaged in concerted action to unreasonably restrain trade as required to state an antitrust claim, without regard to the Certification of Active Supervision. *See* Dist. Ct. Op. at 10–11. The only apparent purpose of this paragraph is to preemptively negate the Board members' anticipated defense of *Parker* immunity. But it is of course black-letter law that a plaintiff need not negate defenses in its complaint in order to survive a Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1304 (11th Cir. 2020) ("A complaint need not anticipate and negate affirmative defenses and should not ordinarily be dismissed based on an affirmative defense unless the defense is apparent on the face of the complaint." (citing *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011))). In fact, by including a reference to the Certification in its complaint, SmileDirect handed the Board members the very allegation to support their argument that the defense of state-action immunity was apparent on the face of the complaint.

district court's denial of a Rule 12(b)(6) motion to dismiss based on state-action immunity.  934 F.3d 1270, 1272 & n.1 (11th Cir. 2019).

In *Diverse Power*, the plaintiff corporation brought federal antitrust claims against the City of LaGrange, Georgia, alleging that a City ordinance created an unlawful tying arrangement by conditioning the sale of the City's water utility services on the installation of natural gas appliances in all new construction (the plaintiff corporation was in the business of providing electrical services that competed with the City's natural gas utility service).  *See id.* at 1271–72.  The City moved to dismiss the federal antitrust claims against it on state-action immunity grounds, arguing that certain Georgia statutes evinced a "clearly articulated and affirmatively expressed" state policy to displace competition.  *Id.* at 1272–73.  Specifically, section 36-65-2 of the Georgia Code "provide[d] that 'in the exercise of such powers [*i.e.*, the "powers specifically granted to them by law," O.C.G.A. § 36-65-1], . . . local governing authorities shall be immune from antitrust liability to the same degree and extent as enjoyed by the State of Georgia.'"  *Diverse Power*, 934 F.3d at 1277 (second alteration in original) (quoting O.C.G.A. § 36-65-2).  The City claimed that because O.C.G.A. § 36-34-5(a)(3) granted the City the authority and power to operate water or sewage systems, it also (by virtue of § 36-65-2) authorized the City to engage in the anticompetitive actions alleged in the

36

complaint, since those actions were related to the exercise of the City's granted authority to provide water utility services. *Id.*

The District Court thus identified the question at the motion-to-dismiss stage as "whether, as a matter of law, the conditioning of water utility service on natural gas installation is a foreseeable result of the anticompetitive conduct authorized by the State of Georgia." *Diverse Power, Inc. v. City of LaGrange, Georgia*, No. 3:17-CV-3-TCB, 2018 WL 9651475, at *4 (N.D. Ga. Feb. 21, 2018), *aff'd,* 934 F.3d 1270 (11th Cir. 2019). If so, then the City acted pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition and was entitled to *Parker* state-action immunity. The only question before the District Court, then, was whether the Georgia statute contemplated the type of anticompetitive conduct raised in the complaint—a purely legal question of statutory interpretation. The District Court needed no additional facts to interpret the statute at the motion-to-dismiss stage, and so the Court proceeded to decide the issue. It found that the City's alleged coercion in the natural gas market, a completely different market, "is not, as a matter of law, the sort of activity contemplated by the legislature in authorizing the operation of water and sewage systems" in § 36-34-5, and therefore denied the City's motion to dismiss on state-action-immunity grounds. *Id.* at *5.

On the City's interlocutory appeal, we determined that we had collateral-order jurisdiction under *Cohen* to review that conclusive determination by the District Court. 934 F.3d at 1272 & n.1. Specifically, we said that "state-action immunity is a form of immunity from suit, not merely from liability. And denials of immunity from suit—like denials of sovereign and qualified immunities—are immediately appealable under the collateral order doctrine."[4] *Id.* at 1272 n.1. But importantly, we only had collateral-order jurisdiction because the District Court made a definitive ruling on the scope of the Georgia statute, and thus conclusively determined that the City was not entitled to state-action immunity.

---

[4] In support of our finding that we had collateral-order jurisdiction, we cited *Commuter Transportation Systems, Inc. v. Hillsborough County Aviation Authority*, 801 F.2d 1286 (11th Cir. 1986). In *Commuter Transportation Systems*, we determined that we had collateral-order jurisdiction to review the District Court's denial of *summary judgment* based on state-action immunity, because such immunity is an immunity from suit rather than a mere defense to liability. *Id.* at 1289–90. In so doing, we concluded that the District Court's denial of summary judgment "finally and conclusively determined" the disputed question—"the defendant's claim of right not to stand trial on the plaintiff's allegations"—because "[t]here are simply no further steps that can be taken in the district court to avoid the trial the defendant maintains is barred." *Id.* at 1289 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 527, 105 S. Ct. 2806, 2816 (1985)). We also noted that the District Court's denial came "[a]fter four years and nine months of discovery, including extensive interrogatories, production of thousands of pages of [the defendant's] records, and seventeen depositions." *Id.* at 1288. Of course, that is not the case here. As explained in Part II, there is nothing preventing the District Court from deciding on summary judgment, after the close of discovery on the relevant *Parker*-immunity facts, that the Board members are entitled to state-action immunity. At *that* stage, the District Court could render a conclusive determination on state-action immunity by construing the relevant facts in the light most favorable to SmileDirect—thereby eliminating any fact issue—and deciding whether, as a matter of *law*, the Board members are entitled to the immunity defense. Unlike in *Commuter Transportation Systems*, then, the Board members here have one more opportunity to convince the District Court at this next step of the litigation that they are entitled to immunity from suit and should not have to stand trial on SmileDirect's Sherman Act claims. Thus, their entitlement to state-action immunity—and their right not to stand trial—have not yet been conclusively determined.

38

The same cannot be said of this appeal. Unlike *Diverse Power*, this is not a case in which the entitlement to immunity rests on a purely legal question, or some other question that is resolvable solely on the allegations in the complaint. Rather, it depends here on additional facts that are not in the complaint (and are not required to be included in the complaint). The District Court, recognizing this, deferred a definitive ruling on the state-action-immunity issue until those relevant additional facts could be discovered. At least at this juncture, it left the immunity question open, and we lack jurisdiction to review an issue that the District Court did not actually resolve below. *See Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1355 (11th Cir. 2014) (finding that the district court's order satisfied the first *Cohen* prong where "[t]he court's order finally settled the question and did not leave anything open, unfinished, or inconclusive").

## II.

What's more, by entertaining and deciding this appeal despite the lack of a final decision below, the majority renders an advisory opinion that defies one of our most fundamental constitutional principles. "[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." *Flast v. Cohen*, 392 U.S. 83, 96, 88 S. Ct. 1942, 1950 (1968) (quotation marks and citation omitted). This ironclad rule derives from Article III's case or controversy requirement: "no justiciable controversy is

39

presented . . . when the parties are asking for an advisory opinion." *Miller v. F.C.C.*, 66 F.3d 1140, 1146 (11th Cir. 1995) (quoting *Flast*, 392 U.S. at 95, 88 S. Ct. at 1950). We therefore have insisted that "[w]e are not in the business of issuing advisory opinions that do not 'affect the rights of litigants in the case before' us or that merely opine on 'what the law would be upon a hypothetical state of facts.'" *Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 733 (11th Cir. 2018) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172, 133 S. Ct. 1017, 1023 (2013)). Today, the majority decides a case that presents no justiciable controversy on appeal—because the relevant issue was never actually resolved by the District Court below, we have nothing to review. And it issues an opinion that cannot have any effect on the pending litigation—at least with respect to the *Parker* immunity issue—except to affirm that the suit may continue on its natural course. Article III prohibits just these types of hypothetical rulings.

To illustrate why the majority's decision on appeal is merely hypothetical, consider what follows today's decision. After this Court affirms the District Court's "denial" (scare quotes intended) of the Board members' motion to dismiss on state-action immunity grounds, the case then returns to the District Court and the Board members must file their answer. In that answer, the Board members will assert a variety of defenses, including that they are entitled to state-action immunity. And they will include in their pleading the additional facts—not

40

included in the complaint—supporting their entitlement to immunity that were not

before the District Court (or this Court) at the motion-to-dismiss stage.[5]

Discovery ensues on the claims and defenses.  At the close of discovery, the

Board members move for summary judgment on the same theory presented here,

but this time armed with the additional favorable facts not previously available for

consideration by the District Court.  The District Court, presented with virtually

the same arguments it was presented with at the motion-to-dismiss stage, must

decide whether the Board members are *now* entitled to state-action immunity under

*Parker*.  It must decide whether, in light of these new facts, the Board members

have *now* met their burden to show that the defense applies.[6]  As the majority

---

[5] It's worth noting that, had SmileDirect not included the allegation regarding the Certification of Active Supervision in its complaint, this is precisely what would have happened. The Board members, lacking any argument that the allegations *in the complaint* show that they are entitled to state-action immunity, would have been forced to file an answer including that argument—and the facts supporting that argument—as a defense.

[6] If the District Court denied immunity at *this* stage of the litigation, we could have collateral-order jurisdiction.  That's because, after discovery has closed and all of the relevant *Parker*-immunity facts have been made available to the District Court, the District Court, in ruling on summary judgment, will construe all of the relevant facts in the light most favorable to SmileDirect, the non-movant.  By thus eliminating any fact issue, the District Court will render a final legal determination on whether the Board members are entitled, as a matter of law, to state-action immunity.  We would have collateral-order jurisdiction to review that final legal determination on appeal.
Theoretically, the District Court could have gone through this exercise at the motion-to-dismiss stage.  It could have construed all of the facts alleged at this stage in the light most favorable to the plaintiff, SmileDirect, and decided whether, accepting the facts as alleged by SmileDirect, the Board members are nonetheless entitled to state-action immunity.  Only then, after having eliminated any fact issue, could the District Court have rendered a final legal determination on state-action immunity that would be reviewable on appeal under *Cohen*.  Of course, the District Court here did not do this.  Rather, it noted that the fact issues were not resolvable at the motion-to-dismiss stage, and so it deferred any final determination of the

41

admits, nothing it says here would prevent the District Court from reaching the opposite conclusion—that the Board members are entitled to state-action immunity and thus entitled to avoid trial on SmileDirect's federal antitrust claims—if the facts revealed in discovery turned out to support that conclusion. *See ante* at 18 n.6.

Finally, when the losing party inevitably appeals the District Court's decision on summary judgment to this Court, we would again have to consider on appeal (1) whether, if the District Court denied the motion for summary judgment based on state-action immunity, we have collateral-order jurisdiction to review the denial of immunity; and (2) whether, if the District Court granted the motion or if we determine that we do have collateral-order jurisdiction to review the denial of

---

immunity issue for resolution at the summary-judgment stage. (Truthfully, the Board members should be thankful that the District Court did not definitively rule on the state-action-immunity defense based only on the facts in the complaint. If it did, and conclusively determined that the Board members were not entitled to state-action immunity, that would be the end of the matter. The Board members could not re-raise the issue at the summary judgment stage.)

Of course, even at the summary-judgment stage, we will not *necessarily* have collateral-order jurisdiction to review the District Court's decision. For example, if the District Court does not eliminate the fact issues by leaning the facts one way or the other, and instead finds that genuine *factual* issues preclude granting summary judgment to the Board members, we would not have collateral-order jurisdiction on appeal. *Cf. Johnson v. Jones*, 515 U.S. 304, 313, 115 S. Ct. 2151, 2156 (1995) (holding that the District Court's determination that the summary judgment record raised a genuine issue of fact—i.e., of "evidence sufficiency"—concerning the defendants' entitlement to qualified immunity was not a "final decision" that was immediately appealable); *cf. also Plumhoff v. Rickard*, 572 U.S. 765, 773, 134 S. Ct. 2012, 2019 (2014) (distinguishing *Johnson* on the ground that the defendant-petitioners in *Plumhoff* "raise[d] legal issues; these issues are quite different from any purely factual issues that the trial court might confront if the case were tried").

immunity, the Board members are entitled to state-action immunity. In other words, we would have to reconsider the same questions that the majority proceeds to decide today, this time based on the new facts found in discovery. Again, nothing the majority says here would prevent a future panel from reaching a different conclusion on state-action immunity at this later stage of the litigation.

So, what exactly does today's decision do? It informs the parties and the District Court of the legal standards that will govern the Board members' defense of state-action immunity. It tells the Board members that the Certification of Active Supervision will not be enough, alone, to satisfy that standard. And it advises the Board members of the types of facts they must allege in their answer and offer as evidence at the summary-judgment stage to establish their entitlement to state-action immunity. Article III does not permit us to engage in this hypothetical exercise or to issue such guidance.

*     *     *

*Cohen* is clear: we may review an otherwise nonappealable interlocutory order only if the district court has, among other things, conclusively determined the disputed question. *Freyre*, 910 F.3d at 1371. "So long as the matter remains open, unfinished or inconclusive, there may be no intrusion by appeal." *Cohen*, 337 U.S. at 546, 69 S. Ct. at 1225. Here, the District Court explicitly did not decide whether the Board members were entitled to state-action immunity, instead finding that a

definitive ruling on that issue would be "premature" and leaving the question open for resolution at the summary-judgment stage of the litigation. Because there has been no conclusive determination regarding the Board members' entitlement to state-action immunity, we lack jurisdiction to consider the issue on appeal.

Moreover, that lack of finality means that today's decision amounts to nothing more than an advisory opinion explaining to the Board members the relevant facts they must unearth in discovery in order to be entitled to summary judgment based on state-action immunity. Nothing about this decision "affects the rights of the litigants before us"—they will get another chance in the District Court to litigate whether the Board members are entitled to immunity. To make matters worse, the majority's opinion—despite having no tangible effect on the instant litigation—creates binding precedent for future litigants seeking the benefit of state-action immunity. Article III prohibits us from rendering such a decision.

Because this appeal amounts to nothing more than a dry run of the Board members' argument that they are entitled to state-action immunity under *Parker*, I would dismiss the appeal for lack of jurisdiction, and wait to reach the merits of the immunity issue when this case inevitably comes before us again after discovery of the relevant *Parker*-immunity facts.[7] I therefore respectfully dissent.

---

[7] In its decision on the merits, the majority, like the District Court, cites *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007), for the standard governing our analysis of the Board members' motion to

dismiss. *See ante* at 10. But it then jumps straight into an analysis of state-action immunity. *Id.* In doing so, the majority's opinion would seem to require that a plaintiff, in order to adequately plead an antitrust violation under the Sherman Act, allege facts showing the *absence* of state action. *See id.* at 10–11. But a plaintiff need not plead the absence of state action as part of the cause of action to state a federal antitrust claim; state-action immunity is a defense that must be pleaded and proved by the defendant seeking its protection. So, the real question in this case is whether the *defendant* Board members have met *their* burden to show that they are entitled to this defense at the motion-to-dismiss stage. *Cf. id.* at 13 (finding that "the Board members have failed to satisfy the *Midcal* test" for state-action immunity); *id.* at 18 ("[T]he Board has not satisfied the active supervision requirement for entitlement to state-action immunity."); *id.* at 25 ("[T]he Board members have fallen far short of establishing that the amended rule was 'in reality' the action of the Governor"). It's an odd question to answer, because the only pleading we have so far is the plaintiff's complaint. That's why when we are faced with a motion to dismiss a complaint based on a defense, we ask whether the defense appears on the face of the plaintiff's complaint. *E.g.*, *Bingham*, 654 F.3d at 1175 (citing *Jones v. Bock*, 549 U.S. 199, 215, 127 S. Ct. 910, 921 (2007)). In other words, we must ask whether the *plaintiff's* allegations adequately support the *defendant's* claims.

In my view, the best way to conceptualize this awkward exercise is to treat the defendant's motion as if it were an answer under Rule 8, which asserts the affirmative defense of state-action immunity and includes the relevant facts from the plaintiff's complaint (and no more). The motion to dismiss would then be treated as a motion for judgment on the pleadings under Rule 12(c). Based on the defendant's "answer," we would ask whether, viewing all the alleged facts in the light most favorable to the non-movant (the plaintiff), the defendant has sufficiently shown its entitlement to an affirmative defense, and thus dismissal of the complaint. So, in this case, we would imagine that the Board members had filed an answer asserting the affirmative defense of state-action immunity, which included only a single factual allegation along the lines of paragraph 45 of SmileDirect's complaint—i.e., the Certification of Active Supervision. The issue to be resolved, then, is whether the Board members have shown—based only on the facts alleged in their hypothetical answer—that they are entitled to the affirmative defense. Working through the analysis in this way ensures that we do not place the burden on the wrong party.

45